**CRAYCROFT et al. v. CRAWFORD et al.***
(No. 9313.)

(Court of Civil Appeals of Texas. Dallas.
May 20, 1925. Rehearing Denied
June 20, 1925.)

**1. Wills ⬥324(3)—Same rules apply in will cases as in other cases.**

In will contest for undue influence, in determining whether or not evidence introduced by contestants is sufficient to require submission of issues to jury, same rules apply as in other civil cases.

**2. Wills ⬥327—On contestees' motion for peremptory instructions, every favorable inference and presumption taken in favor of contestants.**

In will contest for undue influence, on contestees' motion for peremptory instructions, evidence offered by contestants must be given its greatest probative force, and every favorable inference and presumption arising therefrom must be considered as facts established in favor of contestants.

**3. Wills ⬥327—On contestees' motion for peremptory instructions, construction in favor of contestants must be taken.**

In will contest for undue influence, on contestees' motion for peremptory instructions, where evidence is fairly susceptible to more than one construction, construction most favorable to contestants must be taken, and if there exists substantial evidence tending to prove undue influence, trial court must submit such issue to jury.

**4. Wills ⬥324(3), 386—Court cannot weigh and determine probative force of contestant's evidence other than to determine whether case made for jury.**

In will contest for undue influence, neither trial court nor appellate court can weigh and determine probative force of the evidence other than to determine whether case was made for jury.

**5. Wills ⬥155(1)—"Undue influence" defined.**

Undue influence is the exercise of acts or conduct of one person toward another person by means of which mind of latter is subjected to will of person seeking to control it, and as applied to ground of will contest, undue influence has reference to means and methods used and employed by person for purpose of affecting, overcoming, and which ultimately does affect and overcome, free and unrestrained will of testator.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Undue Influence.]

**6. Wills ⬥166(12)—Undue influence may be proved by indirect evidence.**

Undue influence in procurement of will may be proved by indirect evidence and by proof of facts from which it may be reasonably inferred.

**7. Wills ⬥164(1)—Circumstances surrounding execution of alleged will admissible in attempt to establish undue influence.**

In attempting to establish undue influence in procurement of will, all circumstances surrounding its execution and all facts tending to show domination of mind of deceased to will of beneficiary are admissible, when sufficiently related in time to bear on such issue.

**8. Wills ⬥157—Wife's influence over her husband's affections by reason of her virtue, love, and sacrifices not "undue influence."**

The influence by which a wife by her virtue, love, and sacrifices gains over her husband's affections does not constitute undue influence, but must go beyond legitimate argument and persuasion, and amount to domination or coercion.

**9. Wills ⬥156—Less influence required to control testamentary act of weak-minded person than one of vigorous intellect.**

It requires much less influence to control testamentary act of person of weak mind than one of vigorous intellect and determined character, and hence evidence sufficient to raise issue of undue influence in former case might not raise such issue in latter.

**10. Wills ⬥155(1)—Will judged by conditions and at time it was executed.**

Court, in passing on question whether will was obtained by undue influence and disposition made by it unnatural or grossly unjust, can only pass on conditions and judge the will at time it was executed.

**11. Wills ⬥166(12)—Will judged by condition at time of its execution held not unnatural or grossly unjust.**

In will contest for undue influence, circumstances surrounding execution of will, measured by conditions existing at time of its execution, *held* not to show that it was unnatural or grossly unjust.

**12. Wills ⬥166(2)—That testator's wife expressed desire that testator execute will in manner that it was does not establish undue influence.**

That testator's wife repeatedly expressed her desire, not shown to have been made known to testator, that he execute will in terms of one probated, falls short of showing that there

---

⬥For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error granted November 18, 1925.

was an attempt to substitute her will for that of testator, and force him to make will different from his intention.

**13. Evidence ☞54—That will result of undue influence not inferable from inference that other acts of testator result of undue influence of beneficiary.**

Fact that will is result of undue influence cannot be inferred from mere inference that other acts and conduct of testator may have been result of undue influence of beneficiary in will, as an inference cannot be based on an inference.

**14. Wills ☞324(3)—Evidence held insufficient to raise issue of undue influence alleged to have been exercised by wife of testator.**

In will contest for undue influence, alleged to have been exercised over testator by his wife, who was sole beneficiary, evidence that wife entertained unfriendly feeling towards children of testator by former marriage, that as wife of testator she had opportunity to exercise undue influence, and that will was in her possession from time of its execution until produced for purpose of probate, *held* insufficient to raise issue of undue influence.

**15. Wills ☞384—Error in excluding evidence held harmless, where result not affected even if admitted.**

In will contest for undue influence, alleged to have been exercised by testator's wife, who was sole beneficiary, error in excluding testimony tending to show that before their marriage, testator's wife showed both desire and disposition to become possessed of testator's property *held* harmless, where even if it had been admitted, it would not affect conclusion that evidence was insufficient to raise issue of undue influence.

Error from District Court, Dallas County; Kenneth Foree, Judge.

Action by Lucy Craycroft and others against Kate Lamar Crawford and others to set aside alleged will of W L. Crawford, deceased. From a judgment of the district court, refusing to set aside and vacate a judgment of the county court ordering probate of will, plaintiffs bring error. Affirmed.

See, also, 262 S. W. 91.

Locke & Locke, of Dallas, for plaintiffs in error.

Coke & Coke, Smith, Robertson & Robertson, and Etheridge, McCormick & Bromberg, all of Dallas, for defendants in error.

JONES, C. J. This is an appeal by plaintiffs in error Lucy Craycroft, Hunter A. Craycroft, Jeptha D. Crawford, and Meriwether L. Crawford, from a judgment of the district court of Dallas county, refusing to set aside and vacate a judgment of the county court of Dallas county ordering the probate of the will of W. L. Crawford, deceased.

The defendants in error are Mrs. Kate Lamar Crawford and William Lester Crawford. Lucy Craycroft is the daughter, and Jeptha and Meriwether L. Crawford are the sons of the deceased W. L. Crawford by his first wife. Hunter L. Craycroft is the husband of Lucy Craycroft, and is a pro forma party to this suit. Kate Lamar Crawford is the second and surviving wife of deceased, W. L. Crawford, and William Lester Crawford is his son by this second marriage.

For brevity, the plaintiffs in error will hereafter be termed "contestants," and the defendants in error will be termed "contestees."

The ground urged by contestants for setting aside the said judgment is undue influence, and their pleadings on this issue are full and complete. At the conclusion of the trial in the county court a judgment adverse to contestants was entered, from which an appeal was prosecuted to the district court, and a judgment also adverse to contestants there entered, from which latter judgment this writ of error is duly perfected. The cause was tried before a jury in the district court, and continued for approximately four weeks. At the close of the testimony offered by contestants, peremptory instructions were given in favor of contestees, and the said judgment entered on this instructed verdict. Error was duly assigned on the action of the trial court in giving the peremptory instructions in favor of contestees. Error was also assigned on the ruling of the trial court in excluding certain testimony of the witness Willis Evans. Two questions are therefore presented to this court for review: One, on the assignment of error as to the exclusion of the testimony of the said witness; the other, on an assignment of error that the evidence was sufficient to raise an issue of undue influence, and that contestants were entitled to have this issue submitted to the jury.

[1-4] Before stating the material evidence given on the trial of the case, it is deemed profitable first to announce the general principles of law applicable to cases of this character. In determining whether or not the evidence introduced by the contestants is sufficient to require the submission of issues to the jury, the same rules apply as in any other civil case. In moving for peremptory instructions, contestees must be deemed to have admitted the truth of the evidence offered by contestants, and this evidence must be given its greatest probative force. Every favorable inference, fairly deducible from the evidence, and every favorable presumption fairly arising therefrom, must be considered as facts established in favor of contestants. Where evidence is fairly susceptible to more than one construction, or where more than one inference may be reasonably drawn from evidence, the trial court must take the view in each instance most favorable to contestants. When the evidence

is viewed from this standpoint, if there exists substantial evidence tending to prove a fact or facts necessary to 'sustain the charge of undue influence, then it is the duty of the trial court to submit such issue to a jury for its determination. If, however, the evidence when so viewed only raises a suspicion, or only gives rise to a mere surmise that the necessary fact or facts to establish undue influence exist, then contestants' case has failed, and it is the duty of the court to instruct the jury accordingly. In determining the question as to whether the evidence offered by contestants is sufficient to raise an issue for submission to the jury, neither the trial court nor this court can weigh and determine the probative force of this evidence other than for the purpose above stated. After the jury has returned a verdict, then only is the trial court authorized to weigh and determine the probative force of the evidence on which the jury made its findings, and this only for the purpose of determining whether such findings are so against the weight and preponderance of the evidence that the verdict pronouncing them ought not to be given judicial approval.

[5-7] Undue influence may be defined to be the exercise of acts or conduct of one person toward another person, by means of which the mind of the latter is subjected to the will of the person seeking to control it. When this general definition of the term is applied to a ground of contest of the will of a decedent, it may be said that here undue influence has reference to the means and methods used and employed by a person for the purpose of affecting and overcoming, and which ultimately do affect and overcome, the free and unrestrained will of a testator. Undue influence can rarely be established by direct proof, and, accordingly, it is the rule that the fact of its exercise may be proven by indirect evidence and by proof of facts from which it may be reasonably inferred. All the circumstances surrounding the execution of the alleged testamentary instrument, and all the facts tending to show the domination of the mind of the deceased to the will of the beneficiary, are permissible in evidence, provided such facts and circumstances are sufficiently related in time, under well-recognized rules of evidence, to bear on such issue.

[8] There is an influence which a wife, by her virtues, her love, and her sacrifices, gains over her husband's affections and conduct, whereby he may be caused to make a will in her favor, which cannot be considered as and must not be taken for undue influence. Ater v. Moore (Tex. Civ. App.) 231 S. W. 459. A wife may lawfully urge her husband to make a will in her favor, and, in response to her lawful solicitations, the husband may change his mind in reference to the disposition of his property and make a will in the wife's favor, which he would not have made but for her influence, and still there would exist no ground for refusing to admit the will for probate. As between husband and wife, the influence exerted, in order to defeat the probate of a will, must go beyond legitimate argument, legitimate persuasion, and amount to domination or coercion.

To be considered in the light of these principles, the following is offered as a statement of the material evidence admitted in behalf of contestants at the trial:

Colonel W. L. Crawford, the testator, was a man endowed with unusual brilliancy of mind, and had attained a success and renown in his profession as a lawyer that has been the reward of but few. He was a resident of Jefferson, Tex., engaged in the practice of his profession, when, in 1866, he married his first wife. There were born to this marriage the three children who are contestants in this will, and a fourth child who only survived a very short time, the mother and child dying at approximately the same time. There were two brothers who were also lawyers, M. L. Crawford and Dudley Crawford, and these three were engaged in the practice of law at Jefferson under the firm name of Crawford, Crawford & Crawford. After the death of Mrs. Crawford in 1873, the mother of testator presided over his home, and to her charge was committed the three small children. Some few years afterwards, these brothers decided to move to Dallas and establish themselves in that city in the practice of law. In furtherance of this plan, the testator and Dudley Crawford came to Dallas and began the practice of law under the same firm name, M. L. Crawford remaining for some time in Jefferson and the members of testator's family remaining there also. Later, M. L. Crawford, with his family and the mother and family of testator, came to Dallas and all lived in a home purchased by M. L. Crawford on St. Louis street in the city of Dallas. The family living in this home consisted of the testator, his three children, his mother, M. L. Crawford and his wife and their three children. Not very long after the establishment of all the parties in Dallas, Dudley Crawford retired from the practice of law and entered the mercantile business and the firm became Crawford & Crawford. The evidence discloses that the home on St. Louis street was a very happy one and very affectionate, as between the two brothers, the mother, and Mrs. M. L. Crawford and children. The testator later purchased a home on Masten street, and there moved with his mother and his three children, and later a son and daughter of a deceased sister became inmates of that home for the space of about two years.

It appears that from the beginning the brothers had a common bank account, made

common investments, and neither accounted to the other for money used in paying the expenses of living and other kindred matters. Mother Crawford purchased whatever she pleased, and paid for same in checks issued against the common checking account. The evidence discloses that testator had great affection for his children, his mother, and his brother and his brother's children; that he was especially affectionate towards his daughter, Lucy, and his nieces. A great many letters are in the record written by testator to Lucy from the time he first came to Dallas and left her, as a little girl, in the Jefferson home, until almost the day of his death, the only broken period being the two years immediately following his second marriage. These letters are replete with charming and eloquent expressions of sentiments of fatherly love and devotion, and may be aptly described as classics of such literature. Mother Crawford presided over the home until after the marriage of the daughter, Lucy, to Mr. Craycroft, when on account of declining years and failing faculties, the task became too much for her, and she entered the home of M. L. Crawford where she remained until her death. Mrs. Craycroft, who had married in 1890, after this presided over the home of Colonel Crawford. On the first anniversary after the marriage of the daughter, testator gave her a home on St. Louis street, costing approximately $6,000. This was followed later with the gift of a large lot on Masten street on which was a cottage home, and to which the daughter moved, and in which testator made his home until his second marriage. A much more substantial home was later erected by the daughter's husband on this lot, to which the family moved, and in which testator made his home.

The testator married, the second time, Mrs. Kate Lamar, on October 1, 1896. The occasion of the first meeting between testator and Mrs. Lamar was that she desired to institute divorce proceedings against her husband, L. Q. C. Lamar, Jr., from whom she had separated some time previous, and employed the firm of Crawford & Crawford as attorneys to institute divorce proceedings. This was some time in the summer of 1896. The divorce was granted in September, 1896, approximately two weeks previous to the marriage. At the time of this marriage, Mrs. Lamar was living in the city of Dallas in a cottage home owned by her, and her family consisted of herself and a son about 14 years of age. The marriage was consummated at her said home. Mrs. Craycroft was sick at the time of the marriage, but, against the importunities of testator because of the condition of her health, she attended the marriage and gave a bridal present to her stepmother. This record reflects the fact that contestee, Mrs. Crawford, did not have any affection either for Mrs. Craycroft or her two brothers, and the evidence will warrant the conclusion that this feeling of unfriendliness towards Mrs. Craycroft continued from the marriage to the time of the trial. After two visits by Mrs. Craycroft to her stepmother following the marriage, all social intercourse between the two ceased for a period of about two years. It was afterwards resumed, but seems to have been more or less formal in its nature.

On the 8th of August, 1897, there was born to testator and his wife their only child, William Lester Crawford, one of the contestees in this case. On November 1, 1897, the instrument probated as the last will and testament of Colonel W. L. Crawford was executed by him in his own handwriting. It is a model of brevity, and by its terms bequeathed his entire estate, real, personal, and mixed, of whatever kind and wherever situated, to his wife, Kate Lester Crawford, and appointed her his sole executor without bond, and directed that no proceeding be had in any court beyond the probate of the will and the filing of an inventory and appraisement of his estate.

The record also reflects these facts: That Mrs. Crawford did not entertain a cordial feeling for the other relatives of testator, and that it was not her desire that the partnership that had existed so long between testator and his brother, Judge M. L. Crawford, should continue; that she was opposed to the business methods used by the brothers in the matter of using a common bank account and owning and possessing property in common; that after the marriage Mother Crawford was not permitted the right she had theretofore exercised of checking against the common bank account; that Mrs. Craycroft was denied the privilege she had theretofore enjoyed of getting wood and fruit from a farm located near the city of Dallas, and owned by the firm of Crawford & Crawford; that some six or seven years after the execution of the will, the firm of Crawford & Crawford was dissolved, and their common or joint property was divided between them; that following this dissolution, the most cordial relations that had existed for a long number of years between the two brothers became strained, and they ceased social relations and all intercourse with each other, even to the extent of not speaking to each other when they were thrown together.

The record further reflects the fact that Mrs. Crawford desired testator to make the character of will that he executed, as shown by repeated expressions of such desire in conversations with her sister-in-law, Mrs. M. L. Crawford, but there is no direct evidence that this desire was ever made known to testator. In fact, the only evidence of any discussion between them of the subject of testator's making any disposition of his property is the testimony given in the deposition of the witness Missouri Baker, who, in

1897, was a domestic in testator's household. This witness says she heard testator say to Mrs. Crawford that he was going to leave an interest in his estate to his children, and especially Mrs. Craycroft. Such conversation occurred between testator and his wife during the evening meal, and while witness was waiting on the table. This witness stated that such conversation occurred between testator and his wife on more than one occasion while the evening meal was being served, and that on each of such occasions the subject was introduced by testator, and was similar in substance—namely, a statement by testator that he would leave a portion of his estate to his children, and that Mrs. Crawford would reply by telling him to shut up, that he talked too much about it; that she spoke in a good humor, and there was no exhibition of feeling between the two during the times of such conversations. According to this witness, the testator never replied to or heeded this request of Mrs. Crawford, but would continue his discussion of the matter.

The record further reflects the fact that the feeling of testator for his daughter, Mrs. Craycroft, was never diminished during his entire life. Not only did his love for his daughter continue throughout the years, but in numerous letters he manifested great affection for her children, and especially her daughters. The record also reflects the fact that, at least, up to the time of his second marriage, testator intended to devise his property to his children, and this is especially made plain in a letter to Mrs. Craycroft on the day of this marriage. It also reflects the fact that his esteem and love for his nieces, both those of deceased sisters and of his brother, Judge M. L. Crawford, did not diminish throughout his life. At one time, a daughter of a deceased sister was in the hospital at Paris sick, and he sent her financial aid. It is also in evidence that testator complained on one occasion to one of these nieces that his finances were closely watched by his wife. The evidence also fairly reflects the fact that Mrs. Crawford was a woman of strong will and determination about matters that concerned her home, her family's welfare, and her friendships. A great many circumstances tending to show this are in evidence, but as they all merely tend to establish the conclusion above stated, it is not necessary to incumber the record with their recital.

The record further reflects the fact that after the marriage of Mrs. Craycroft in 1890, and previous to the second marriage of testator, he had made two substantial gifts to Mrs. Craycroft—one, of a house on St. Louis street, on the first anniversary of her marriage, another, of a house on Masten street, some few years after her marriage, and to which she moved—that the aggregate value of these gifts was approximately $10,000; that testator had spent a great deal of money, estimated by him in a letter to one of his sons at $60,000, in the education of the three children. There is no record of his having given these two sons of his first marriage any other property. Subsequent to the execution of the will, the testator presented to Mrs. Craycroft, by deed of gift, an undivided one-half interest in approximately 2,400 acres of land located in Jack county, Texas. This is all the property given to Mrs. Craycroft after the execution of the will, and its value at the time of the gift or at the time of the trial is not shown other than at one time it was worth perhaps $8 an acre. It was not improved, but was used as pasture land.

After the execution of the will, testator gave to Mrs. Crawford, in her own right, the home place in the city of Dallas, that had been purchased the first year of the marriage, and which was estimated at the time of the trial to be of the value of $40,500. However, Mrs. Crawford, at the time of this gift, owned an interest in her own right in this home. When the home was purchased, on March 9, 1897, the consideration paid for same as recited in the deed was $5,000 cash and two notes, one for $2,500 and the other for $2,000. It appears, however, that the home owned by Mrs. Crawford before her marriage to testator was taken in on this purchase, and really constituted the recited cash payment. A life insurance policy that had been issued to testator previous to this marriage, and which was originally payable to his estate had been changed, and Mrs. Crawford made the sole beneficiary. This life insurance, amounting to $7,367.16, had been collected by Mrs. Crawford previous to the trial. In addition to these gifts, she had been given other property by testator of the value of approximately $20,000. Property of a very substantial value had been given by testator to his son, William Lester Crawford.

The value of testator's estate at the time of his death, as shown by the inventory filed in the probate court, was $135,983.25. This value included testator's portion of the community estate that had been acquired during this second marriage. This portion of said community estate was valued in the inventory at $55,033.25. Testator's separate estate, therefore, at the time of his death, was of the value of $80,950. This value, of course, represented property owned by testator previous to his marriage, and owned by him when the will was executed more than 22 years previous to his death. This value related to the time of the trial and not to the time of the execution of the will. It consisted mainly of property in the city of Dallas, and, of course, has been subject to the general enhancement of values of property in said city during the period of years that

have elapsed since the making of the will. An idea of this enhancement is shown by the evidence in reference to the home place on Ross avenue. As we have seen it cost, in 1897, the sum of $10,000. Its value as estimated in the inventory at the time same was prepared, was $40,500. It is also in evidence that the most valuable piece of testator's separate property at the time of the execution of the will was incumbered by a mortgage debt of $8,000. It is therefore a reasonable conclusion that the estate of testator on November 1, 1897, was of the approximate value of $30,000. There is no evidence that the two sons of testator by the first marriage at the time of the execution of the will owned any property in their own right, and it is a reasonable deduction from the evidence that they did not. These two sons, however, assigned their interest in testator's estate to Mrs. Lucy Craycroft previous to the filing of this suit.

At the time of the execution of the will, Mrs. Craycroft was living in a home built by her husband at a cost of $20,000, and he was in a remunerative business. At the time of the death of testator and for a few years prior thereto, the husband of Mrs. Craycroft had become in straitened financial circumstances, due to a failure of his health and a consequent surrender of his position with his employer, an insurance company. At the time of the trial, the only property that Mrs. Craycroft owned was some land in Marion county that had been received by her from testator in settlement of her mother's estate, and this was of little value, a portion of the Masten street lot, with a small residence thereon very much out of repair and which brought but little income, and her undivided one-half interest in the 2,400 acres of land in Jack county, the entire acreage of which yielded a rental for use as a pasture of $1,000 a year. After the payment of the taxes and other expenses incident to such ownership, the income from this source was small. The income of her husband at this time was little in excess of $200 per month, due to renewals from the insurance business transacted by him while he represented the insurance company. This was growing smaller every year, and would cease entirely after a few years.

Mrs. Crawford, at the time of the death of testator, was possessed of the property named above that had been given her in her own right by testator during his lifetime, and her community interest of $55,033.25 in the estate of testator. In other words, the sole beneficiary under the will had property in her own right and in her right in the community amply sufficient to provide for all her wants during her lifetime.

The issue to be determined by this court on this testimony is, was it sufficient to have made an issue of fact as to whether the free

275 S.W.—9

agency of testator had been supplanted and the said will executed under such subjection, or surrender of the natural freedom of action over the matter of making the will as that it speaks the mind of Mrs. Crawford and not the mind of testator? This issue must be determined by an analysis of the evidence under the rules of law above announced. Such analysis, in our opinion, discloses that the evidence fails in respect to almost every element, the existence of which is usually considered necessary to make a case of undue influence.

[9] 1. The mind of testator at the time of the making of the will was neither weak nor wavering in decision and judgment, or impaired by age or disease; but, on the contrary, at said time the testator was in full possession of all those mental powers that had enabled him to reach and hold an exalted position in his chosen profession of law. While an attack on a will on the ground of undue influence necessarily concedes the existence of testamentary capacity, yet the undue influence which would invalidate a will depends, to a very considerable extent, on the intellectual capacity and firmness of the testator. It must be conceded that it requires much less influence to control the testamentary act of a person of weak mind or infirm will than one of vigorous intellect and determined character. 29 R. C. L. 139. It logically follows that evidence which might be sufficient to raise an issue of undue influence in the former case may not be sufficient to raise such issue in the latter case.

[10, 11] 2. The circumstances surrounding the execution of the will negative any idea that it was unnatural or grossly unjust. At the time of its execution, the testator was not possessed of any considerable estate. The daughter, Mrs. Craycroft, was living in a pretentious home, and her husband was engaged in an honorable and lucrative business. The two sons were young men who had been educated at great expense, and presumably were thoroughly prepared for the battle of life. The testator was 59 years of age, and had recently married a wife much younger than himself. To this marriage there had been born a child, then less than three months of age. The testator, it is true, was in vigorous health, but he was at an age in which the tenure of life has become uncertain. The same duty that had rested upon him in reference to the children of the former marriage in educating and providing for them in life, a duty he had performed with most scrupulous care, now rested upon him anew in the persons of a wife and an infant child; so, against the contingency of death, he executed the will providing for those who at that time were unable to provide for themselves. If this will should be measured by conditions as they existed at the time of the death of testator, it perhaps would be

subject to the criticism that, in view of the profound love he entertained for the daughter, and in view of her then straitened circumstances, it is not such a will as would ordinarily be expected, and would be open, therefore, to the charge of being unnatural and unjust. This court can only pass on conditions and judge this will at the time it was executed.

[12] 3. There is no direct evidence that Mrs. Crawford attempted to exert any influence over testator in reference to making a will. There is evidence that near the time the will was executed, Mrs. Crawford had repeatedly expressed her desire to Mrs. M. L. Crawford that testator execute a will in the terms of the one probated. This desire on her part is not shown to have been made known to testator. There is evidence, also, that shortly previous to the execution of the will, and during the first year of the marriage, the testator, in the presence of Mrs. Crawford, declared his intention to remember the children of his former marriage in the disposition of his property, and that Mrs. Crawford, in effect, told him that he talked too much about that matter, and commanded him not to discuss it. At most, this evidence could only carry with it the idea that she was not favorable to such a disposition of his estate. This falls far short of showing that there was an attempt to substitute her will and desire for his will and desire, and coerce him to make a will different from his intention. In expressing a desire for the execution of such a will by testator, she was entirely within her rights as a wife who was shortly to become the mother of an infant child, and she would have remained within her rights even if she had gone so far as to urge upon testator the making of a will in her favor, especially in view of the relative smallness at that time of his estate.

[13] 4. The evidence does not establish the fact that undue influence was exercised by Mrs. Crawford on the acts of testator in reference to any of the other transactions shown to have occurred. The testimony of the transaction of countermanding the order of Mrs. Craycroft for wood off of the common property of the firm of Crawford & Crawford, of denying Mrs. Craycroft any fruit from the orchard on this same property, of denying Mother Crawford the right to check against the common bank account of the firm, of the dissolution of the partnership of Crawford & Crawford that had so long and with such cordiality existed, and the breaking off of the close personal and fraternal relations that had existed between testator's kindred and himself, it is contended is sufficient to establish the fact that the result in each instance was brought about by the exercise of undue influence by Mrs. Crawford on the testator. We do not think it is sufficient to establish this fact in any

of the said instances. At most, it could only be sufficient to authorize the inference that such results were accomplished by means of undue influence on the part of Mrs. Crawford. The fact that a will is the result of undue influence cannot be inferred from the mere inference that other acts and conduct of the testator may have been the result of undue influence of the beneficiary in the will. On the issue of undue influence in the contest of a will, an inference can no more be based upon an inference than in reference to any other fact sought to be established in the trial of a cause.

[14] The evidence is sufficient to show that contestee, Mrs. Crawford, entertained unfriendly feeling toward Mrs. Craycroft, and that the act of testator in denying her and her two brothers any share in his estate was a matter very satisfactory to her. The evidence discloses further that, as the wife of testator, she had opportunity to exercise undue influence in the matter of making the will. The evidence further warrants the conclusion that the will had been in possession of Mrs. Crawford from about the time of its execution until it was produced for the purpose of probate.

The evidence is not sufficient, under any of the authorities, to raise an issue of fact that the will in question was produced by the exercise of undue influence on the mind of the testator. The testator was a brilliant lawyer, and knew that if the will in possession of his wife was not the one he desired, he could in a very few minutes execute another and thereby revoke the one that did not speak his desire in reference to the disposition of his estate. Over 22 years elapsed from the execution of the will to the day of testator's death. There is not a word in the evidence that he ever expressed his dissatisfaction with its terms. During all these years, according to this record, he maintained the vigor of his intellect and the strength of his character, and permitted it to stand as it had been written. Under such condition, it is not the province of a court to write for him another and different will. We therefore hold that the court correctly construed the evidence as being insufficient to raise the issue of undue influence. Scott v. Townsend, 106 Tex. 322, 166 S. W. 1138; Cook v. Denike (Tex. Civ. App.) 216 S. W. 437; Fox v. Bierman (Tex. Civ. App.) 257 S. W. 969; Houston v. Holmes (Tex. Civ. App.) 241 S. W. 1039, and Id. (Tex. Civ. App.) 262 S. W. 849; Simon v. Middleton, 51 Tex. Civ. App. 531, 112 S. W. 441.

Contestants insist that there is as much potency in the evidence in this case on the issue of undue influence as in the case of Scott v. Townsend, supra. To this contention we cannot agree. In the reported case there was the fact of an unnatural and unjust will as between the two children of tes-

tator. There was also evidence of coercion on the part of the mother of the favored child to force a will very unjust to the daughter of testator by a former marriage. In addition to this, the Court of Civil Appeals held there was direct evidence of the exercise of undue influence over the mind of testator in the very act of making the will. All of these elements are absent in this case.

[15] Error is assigned on the refusal of the court to admit certain evidence given in deposition by the witness Willis Evans, and offered by contestants. We have carefully read this evidence, and believe that some of it should have been admitted, and that the court erred in sustaining objections to its introduction. It related to visits of testator, for a space of two or three weeks previous to his marriage, to the home of Mrs. Crawford, then Mrs. Kate Lamar. This rejected evidence it is not necessary to give in detail, but its tendency was to show that, at that time, evidently during the period of the engagement, Mrs. Crawford showed both a desire and a disposition to become possessed of the property of testator. These visits occurred a little more than a year before the execution of the will, and in the broad latitude allowed this character of a case, where undue influence is sought to be established alone on circumstantial evidence, we believe any fact within this range of time to the execution of the will, even though before marriage, that tended, even remotely, to show the disposition of the beneficiary of the will in reference to possessing herself of the property of the testator, is admissible testimony. However, in reaching our conclusion that the evidence was insufficient to raise the issue of undue influence, we have considered this evidence in its relation to this question, and have concluded that even if it had been admitted, the result would necessarily have been the same, and that the error in denying its admission was immaterial.

Our opinion is that this case should be affirmed.

Affirmed.