CRAYCROFT et al. v. CRAWFORD et al.
(No. 809–4472.)

(Commission of Appeals of Texas, Section A. June 9, 1926.)

1. **Wills ⬉386—Court on appeal in will contest cannot pass on credibility of witnesses or measure of weight to be given their testimony.**

Credibility of witnesses and measure of weight to be given their testimony is beyond jurisdiction of appellate court in will contest, but, verdict having been directed for contestee, the evidence, so far as tending to establish the charge of undue influence, imports verity.

2. **Wills ⬉164(5)—Motive is relevant on contest for undue influence.**

Motive is a relevant inquiry on contest of will for undue influence, and when proven is a circumstance with relation to the truth or falsity of the charge.

3. **Wills ⬉324(3).**

Evidence of motive and purpose of beneficiary *held*, on contest of will for undue influence, sufficient for jury.

4. **Wills ⬉164(1).**

Opportunity is relevant on contest of will for undue influence, exclusiveness of intimate contact and availability of means increasing its probative force.

5. **Wills ⬉324(3).**

Facts and circumstances in evidence on contest for undue influence of unwitnessed, holographic will, with second wife as sole beneficiary, *held* sufficient to present for consideration of jury the condition of opportunity.

6. **Wills ⬉156.**

Mental condition of testator, as a fact or circumstance, is of a kind with opportunity of beneficiary, relative to undue influence.

7. **Wills ⬉164(7)—Contestants being unable to show conditions immediately surrounding execution of will, held, jury could consider whether testator in one of shown periods of intoxication yielded to undue influence.**

Contestants not being in position to show the conditions immediately surrounding execution of unwitnessed holographic will, *held*, in view of evidence of periods of intoxication of defendant, that jury had right to consider whether in one of them testator's otherwise strong intellect yielded to undue influence.

8. **Wills ⬉55(10), 166(5).**

Will making testator's wife sole beneficiary, when evidence shows he had as great love for

daughter by former marriage, may be taken by jury as indicative of irrational or subjugated mentality.

**9. Wills ⟨key⟩324(3)—Inconsistency of will with testator's purpose, declared about time of its execution, is matter for jury's consideration on mental state or undue influence.**

Inconsistency between will, leaving all to testator's second wife, and testator's purpose, declared at or about the time of its execution, to leave something to children by former marriage, is a matter for jury's consideration on mental state or undue influence.

**10. Wills ⟨key⟩166(1).**

Evidence of acts and statements *held* to warrant belief by jury that after will's execution testator was never conscious of its existence.

**11. Wills ⟨key⟩166(1).**

Mental incapacity being otherwise disproved, testator's lack of conscious knowledge of the will reasonably gives support to inference of subversion of his mind.

**12. Wills ⟨key⟩166(1).**

Habitual subjection of one to control of another is evidence of purpose to acquire and use undue influence, and some evidence of its acquest.

**13. Wills ⟨key⟩164(5)—Habitual subjection of testator to beneficiary's control is relevant to use of undue influence in execution of will, where opportunity is not precluded by other evidence.**

Where actual opportunity to exert undue influence in immediate connection with execution of will is not precluded by other proof, habitual subjection of testator to control of beneficiary is relevant to use of such influence at that moment.

**14. Wills ⟨key⟩324(3).**

Whether power habitually used over testator by beneficiary wife was undue influence, and so relevant to question of use of like influence as to will, *held*, under the evidence, question for jury.

**15. Evidence ⟨key⟩76—Failure of contestee, apparently having exclusive knowledge, to testify to mental condition of testator, questioned by contestant's evidence, held to have some probative force as pointing to undue influence.**

Evidence of contestant presenting basis for hypothesis that testator at time of making will was not in full possession of all his mental powers, failure of contestee, apparently having exclusive knowledge in respect to the exact matter, to testify, though introducing other evidence, had some probative force as pointing to undue influence, and as strengthening unfavorable inferences which might be drawn from other facts and circumstances.

**16. Wills ⟨key⟩324(3).**

Basic facts in evidence *held* to make a jury issue of undue influence in procurement of will.

**17. Evidence ⟨key⟩54.**

A circumstance shown by direct evidence is a fact proved, and not one inferred, relative to rule against pyramided inferences.

Error to Court of Civil Appeals of Fifth Supreme Judicial District.

Proceeding by Lucy-Craycroft and others against Kate Lamar Crawford and another to vacate probate of will. The Court of Civil Appeals (275 S. W. 124) affirmed a judgment for contestees, and contestants bring error. Reversed and remanded.

Locke & Locke, of Dallas, for plaintiffs in error.

Coke & Coke, Smith, Robertson & Robertson, and Etheridge, McCormick & Bromberg, all of Dallas, for defendants in error.

NICKELS, J. A paper of date November 1, 1897, and of purported holographic text, was probated as the last will and testament of Colonel William L. Crawford. Devise and bequest of his entire estate to his second wife, Mrs. Kate Lamer Crawford, was thereby evidenced, and no reference to the children of a former marriage or to the child of the second marriage was made therein. The children of the first marriage seasonably instituted proceedings for vacation of the probate and voidance of the will. Trial in the probate court resulted adversely, and these children duly prayed appeal to the district court.

Asserted invalidity rests upon these charges: (a) The instrument, which was not found amongst the papers of the deceased, but which was "procured from * * * the private lock box of the defendant" (the second wife), "to which Colonel William L. Crawford did not have access," was not "in fact his will and testament." (b) "If the same was executed by the said Colonel William L. Crawford, the defendant" (second wife) "procured such execution by means of undue influence exerted by her over the said Colonel William L. Crawford." The basic charges are given detailed support in the averments. Upon the trial in the district court, voluminous testimony and documentary evidence were introduced by the contestants, and a considerable volume of documentary evidence was introduced by the contestees. At conclusion of the evidence a peremptory instruction for a verdict in favor of the contestees was given to the jury. Verdict was returned thereon and the appropriate judgment entered. Upon appeal of contestants the judgment was affirmed by the honorable Court of Civil Appeals, Fifth District (275 S. W. 124).

Upon the trial certain testimony of Willis Evans offered by the contestants was excluded. The Court of Civil Appeals held that this evidence should have been admitted; to

that conclusion we agree, and hereinafter consider the testimony in respect to its probative force.

[1] The determinative question, of course, is the sufficiency or not of proof to raise an issue of fact upon the charge that the will (if executed at all or other than manually by the testator) is a product of undue influence exerted by the second wife. Credibility of the witnesses and measure of weight to be given their testimony is beyond our jurisdiction; the evidence to the extent that it tends to establish the charge made, for present purposes, imports verity. The fact that the opinion of the honorable Court of Civil Appeals, in the main, has reference to intermediate and ultimate conclusions of fact rather than to the evidence itself makes necessary a somewhat extended discussion of the record and of the principles of law relevant thereunto.

[2, 3] 1. Wherever sinister conduct becomes justiciable, motive is a relevant inquiry; when proven it is a circumstance with relation to the truth or falsity of the charge, e. g.: In a prosecution for murder. Undue influence as the basis of an attack upon a will is not an exception to the rule. Kennedy v. Upshaw, 64 Tex. 411; In re Arnold's Estate, 147 Cal. 583, 82 P. 252.

Prior to 1896, the sole beneficiary of the will was the wife of Lamar, who resided in Washington, D. C. She came to Dallas, and, in 1896, through Colonel Crawford and his brother as attorneys, instituted divorce proceedings against Lamar. The divorce was granted September 16, 1896, and on October 1, 1896, she and Colonel Crawford were married. A son was born to them August 8, 1897. They had no other children. According to the testimony, at an unnamed date (but apparently within a short time after the marriage) she stated to Mrs. M. L. Crawford (a sister-in-law) that "she had been advised by friends in Washington to leave her husband and come to Dallas and catch Colonel Crawford." That witness testified also that "she had a conversation with me regarding the expectant birth" of the son; "she wanted to know what she would be entitled to should she become Colonel Crawford's widow;" "she thought it proper to have one child, but insisted that there should never be another; she said that she expected to have one child for the purpose of obtaining an inheritance—a mother's and a wife's inheritance."

And, as stated by the Court of Civil Appeals:

"The record further reflects the fact that Mrs. Crawford desired testator to make the character of will that he executed, as shown by repeated expressions of such desire in conversations with her sister-in-law, Mrs. M. L. Crawford."

There are (as will be seen) other facts and circumstances related by the witnesses which might be taken in corroboration and elaboration of those just detailed, but the testimony stated might be taken by the jury as sufficiently indicating motive and purpose.

[4, 5] 2. Opportunity, of course, has relevancy. 40 Cyc. 1163, and cases there cited. However slight may be the probative force of mere opportunity, its effect is increased accordingly as the proof may show exclusiveness of intimate contact and availability of means to make the opportunity effectual.

Tom Angus (who, at the time, conducted a livery establishment) said (he was) "very intimately acquainted with" Colonel Crawford "for a number of years." "Prior to his marriage with Mrs. Lamar, the Colonel never was a frequent rider in carriages, but I have driven him several times at night—I drove him on different occasions to the vicinity of Mrs. Lamar's house." "I have never driven him to Mrs. Lamar's house so full of liquor that he could not and did not take care of himself, but it was plain he was under the influence of liquor." "His visits to Mrs. Lamar's house extended over a period of several months prior to their marriage." "Colonel Crawford would get on a spree sometimes for a week, and I would take care of him—these occurrences were before his marriage to Mrs. Lamar and afterwards also." "I recall another occasion after Colonel Crawford and Mrs. Lamar married that he got so full that he went about my place undressed with an umbrella over him." "I think that after his marriage with Mrs. Lamar that he did a little better in respect to his habits of sobriety, but he was bad enough."

According to Mrs. M. L. Crawford, the wife stated that she "herself was quite cordial in everything that cordiality could give and that she indulged him, that she made his visits perfectly comfortable and agreeable, and that she provided him with liquor, and mint juleps—always had a nice, iced mint julep ready for him setting by the chair that he was to occupy." This statement referred to the period immediately preceding the marriage.

Willis Evans (coachman and body servant for Colonel Crawford during the "summer of 1896 and after") said that both before and after the marriage he drove Colonel Crawford to Mrs. Lamar's house once or twice a week; Colonel Crawford would be alone on these occasions; that sometimes he would wait for Colonel Crawford to take him away from the house and sometimes, upon Colonel Crawford's instructions, he would go home and put up the team and not wait for him; that on the occasions when he would wait for Colonel Crawford he would know when the Colonel was ready to leave by the opening of the door allowing the lights to shine on "the board fence"; and that whenever he saw this light he would come for the Colonel; that sometimes Colonel Crawford

would leave "about 10 o'clock"—"sometimes later"; that "on two occasions he" (Colonel Crawford) "was late, one of them the chickens were crowing, and I· guessed it was before day, and the other one was between midnight and day"; on the two occasions just referred to, he would go "to the porch" for Colonel Crawford—the Colonel had taken just a little too·much on those two occasions" and "it was necessary" for Evans "to assist" Colonel Crawford—on the two occasions referred to, he saw Mrs. Lamar, and she assisted Colonel Crawford to the carriage on one of them, and on this occasion she said to Evans, "Willis, take good care of the Colonel; he is all I have got, and what he has got is all I· have got"; and she "had on a loose wrapper, just a house dress like they wear, * * * those loose wrappers"; that when he referred to Colonel Crawford having "taken a little too much" he meant that he was drunk.

A "wedding" trip to Mexico City was begun on the day of the marriage. Upon return to Dallas, Colonel Crawford changed his residence from the house of his brother (where also resided his aged mother) to the house then (and thereafter) occupied by his wife. Thereafter the household consisted of Colonel Crawford, his wife and her son by Lamar and the boy born August 8, 1897.

The will purports to have been executed November 1, 1897. It is without "subscribing witnesses" and of holographic text. So far as the record shows, Colonel Crawford or his wife did not, at any time or to any one, mention the fact that he had executed a will. It was not found amongst his papers, but, two days after his death, was taken by his wife from a lock box in the vaults of the American Exchange National Bank which was rented in her name and to which Colonel Crawford did not have access. The facts and circumstances just indicated are sufficient to present for consideration by the jury the condition of "opportunity."

[6, 7] 3. "Mental condition" of the testator, as a fact or circumstance, is of a kind with "opportunity" of the beneficiary to achieve and use undue influence. This matter, in its more general scope, will receive attention in other connections, but there are some things which ought to be mentioned here.

Some witnesses expressed the view that Colonel Crawford's mentality included a "giant intellect," and that in point of juridical learning and professional skill he was without a superior. These views, however, had generality for a basis, and, obviously, they were not intended to include or relate to periods of conduct such as that described by Angus and Evans. Whether the instrument was prepared and signed at a time when and in circumstances whereunder liquor did not or could not add its force either as a needed opportunity for or as a means of undue influence is left without ex-planation in the record; that it might, either directly or as a medium, furnish explanation of the "inconsistencies" to be mentioned is obvious. From what has been shown, it is plain that the plaintiffs in error are not in a position to show the conditions immediately surrounding execution of the will. With the needed data absent and, maybe, locked in the mind of the sole beneficiary, the jury would have the right to consider whether in a period of intoxication the otherwise strong intellect yielded to unduly exerted importunities.

[8] 4. The philosophy of law allows untrammelled range for natural affection. It includes the postulate of their reflection in dispositions of property made in contemplation of death.

"One of the main objects of the acquisition of property by the parent is to give it to his child; and that child in turn will give it to his, and in this way the debt of gratitude we, owe to our parent is paid to our children. Each generation pays what it owes to the preceding one [by payment], to the succeeding one. This seems to be the natural law for the transmission of property." Saufley v. Jackson, 16 Tex. 579, 581.

The thought underlies our statutes of descent and distribution. Equality as between children in devolution of property by operation of law, in deference to presumed impartiality of love, is there preserved as is measurably done in the constitutional inhibition of primogeniture. Judge Lipscomb (in Saufley v. Jackson) did not mean to imply that a child should exclude a parent or step-parent in "the natural law of transmission," nor is there just basis elsewhere for that thought. The surviving spouse owns one-half of the community estate as an incident of matrimony, along with a portion of the decedent's separate property, if the matter, ab intestato, be left to that public policy which is given body in the statutes.

This does not mean, of course, that a sane man may not, in presenti or in futuro, do with his own as he may choose—enriching here and leaving poverty there as to him seems fit. But it does mean that the force which natural affection (in respect to near relatives) exerts upon the giver is not undue influence; on the contrary it is due influence. Millican v. Millican, 24 Tex. 426; Smith v. Smith (Tex. Civ. App.) 153 S. W. 918; Powell v. Powell, 170 S. W. 111; Ater v. Moore (Tex. Civ. App.) 231 S. W. 459; Mackall v. Mackall, 135 U. S. 167, 10 S. Ct. 705, 34 L. Ed. 84. That truth, by a negative pregnant, supports a reasonable mind in its concept that a devise or bequest which reflects absence of the due influence which ordinarily is incident to· the relation of parent and child, in turn, reflects abnormality in the parent unless corresponding abnormality (therefore explanation) in the relationship itself be also developed. If all explanation be lack-

(285 S.W.)

ing, the trier of fact may take the circumstance as a badge of disordered or lapsed mentality or of its subjugation; if some explanation be advanced, the jury may pass upon its adequacy and attribute to the circumstance and its explanation such weight as may be thought proper, having in view all other relevant evidence. Cockrill v. Cox, 65 Tex. 669, 678. A consequence is that where the evidence shows existence of two persons equally entitled to· and possessed of the father's love, and one of them has been made the sole beneficiary, there can be no presumption that the result was produced by due influence exerted by the favored one merely through kinship and observance of connubial or filial duties. There would be still less warrant for the thought if evidence tended to show the disinherited one occupied a surer place than did the favored one in the testator's affections. Given either hypothesis, an inquiry for a cause other than due influence naturally projects itself. The jury may rightly believe that an irrational or a subjugated mentality constitutes the reasonable explanation; perforce, if rationality be proved or assumed, subjugation may be thought of as the sole cause.

At least the first hypothesis is exhibited in Colonel Crawford's letters to his first born, Lucy. Their correspondence extended through a period of 43 years immediately preceding his death, and the uniform tenor of his declarations may be illustrated by a few excerpts.

October 20, 1877: "You are the embodiment to me of all that is beautiful sweet and delicate, and I trust that now your young character is forming it will be as lovely and as graceful as your features and your form. * * * ·God bless you my sweet child; Goodnight."

Austin, April 11, 1883: "The work of constructing the new Capitol has commenced and a great excavation may be seen on the site of the old building, over which you will remember, we climbed years ago and where from the old board roof I cut your name on the topmost stone of the historic building. * * *"

September 30, 1896—day before his marriage to Mrs. Lamar: "After almost thirty years of care and tenderness for you, I need not assure you of my continued devotion for the future."

July 18, 1910: "I was pleased on your last visit here to make you a present of one-half of the William McDonald survey. * * * The only regret I have about the matter is that I am not able to give you a million acres of land instead of a thousand."

January 30, 1918: "Now that you are a grandmother * * * and as many years have passed with both of us, it is but simple justice to you, my child, to say that I have never received one unkind word from you. To me, your whole life has been one of affection and tenderness."

However strong the affection of Colonel Crawford for his wife may have been, the evidence is sufficient to warrant the jury in believing that his love for Lucy (who was disinherited) was at least of equal volume and depth. Under such conditions a court has no warrant to say that, as a matter of law, unequal devises and bequests are products of due influence.

[9] 5. Juxtaposition of word and act is included in the jury function. Here, as elsewhere, they may speak with distinct yet harmonious effect, or they may express emphatic non sequitur; in either case, they bear upon mental state itself or upon the ascertainment of whether an act is the result of an external force superiorly operated against a potentially rational intellect, or they may be taken as doing so. Harmony apparently reflects able, sedate, and independent mind and normal functioning of reason. Discord, as apparent, is a child of disorder or of a dependent intellectual functioning. The conflict of word and act may be due to weak character instead of weak mind, dissimulation instead of honest purpose, or it may have source in the inconsistencies to which mankind seems to be heir. But, obviously, it may also be ascribable to contact of external power with a mind whose offspring, else, would have a natural symmetry. To an extent, therefore, to which the other possibilities may be removed by evidence showing a strong intellect and character, integrity of purpose, and generally rational conduct, possibility of an act being the result of undue influence becomes the more reasonable explanation. Upon evidence which need not be detailed, the honorable Court of Civil Appeals found that "up to the time of his second marriage the testator intended to devise his property to· his children, and this is especially made plain in a letter to Mrs. Craycroft on the day of his marriage." It may be added that the jury could properly have treated the incidents related by Missouri Baker as having transpired on or immediately about the date of the will (Scott v. Townsend, 106 Tex. 341, 166 S. W. 1138), and, so considered, the testimony tends to show a then existing and settled purpose to leave something to the children. Yet notwithstanding deliberate intent thus shown, the will in question completely ignored the children, and thus inconsistency of declared purpose and of actual conduct is presented by the record.

6. There is some basis for analogy in respect to probative force between the fact or circumstance of inconsistency and that of folly. Time was when "one word of folly" voided a testamentary grant. Swinburne, part 2, § 3; Waring v. Waring, 6 Moore, P. C. 349; 1 Redfield, Wills, 121. With development of jurisprudence, the absolute effect of folly has disappeared, but in a proper case it remains a thing to be considered. Ordinarily, its relation is to mental condition per se, and when unexplained it may be regarded as tending to show lack of testamentary capacity. But, if both that capacity and the cir-

cumstance be shown, ex necessitate folly relates to some abnormal condition wherein the otherwise able mind was not left free to give effect to its own promptings. Manifestly, too, as the proved degree of mental strength and general integrity of character is increased, the probability of force aliunde and its overweening use is likewise emphasized by the persistence of folly. If in such a case the jury accepts the postulate of a "giant intellect," it may then (properly) consider whether execution of the will itself be the act of folly or whether it be the sensible thing and the other act be foolish. If the proof as interpreted and measured by the jury impresses upon the will an irrational character, then the jury may consider whether it is a result of undue influence. This is so because reasonable men do not expect a well-ordered mind to project disordered thought into conduct; and if an ordinarily normal mentality and a foolish act be proved they are likely to infer a casual surrender of the mind as the producing cause.

[10, 11] In our opinion the record contains warrant for a jury's belief that Colonel Crawford was never subsequently conscious of the existence of a will. If to any person he ever mentioned the will the fact is not shown. Apparently the instrument got into the exclusive possession of the sole beneficiary at the time of its execution or shortly thereafter, for it was by her taken from a lock box which had been under her exclusive dominion. It had no attestation, and (in the probate) it was not proved otherwise than by identification of the handwriting. The testimony of Angus and Evans in relation to Colonel Crawford's habits during the period in which the will appears to have been written affords a hypothesis for its existence without his subsequent consciousness. To that hypothesis absence of that due influence which would be expected as incident to the love for the daughter and the "inconsistencies" pointed out above contribute support and to the sum of these things additions must yet be made.

The son was born August 8, 1897. The will's date is November 1, 1897. Missouri Baker served in the household for eight months in 1897. She was there when the child was born. The time of commencement of that eight months' period is not otherwise fixed. The period may have included the day on which the will was made. Some of the statements made by Colonel Crawford and detailed by her may have been made before the will was signed, others may have been made on that day, and still others may have been made after the execution of the will (or all of them may have been made either before or after that date), for, she said, the subject-matter was mentioned "more than once; maybe about a dozen times." Colonel Crawford, she said, "did bring up the conversation * * * at different times when he would get to talking." Under these conditions it would have been for the jury to say what were the relative dates of the conversations. Scott v. Townsend, 106 Tex. 322, 341, 166 S. W. 1138. The statements were all of like import, and they tended to show Colonel Crawford's intent and purpose that the children should participate in his estate. If any of them were made after November 1st, obviously, their making would probatively indicate lack of remembrance of the will which was executed; if all of them were made after November 1st, that probative force would be correspondingly increased.

July 21, 1893, Colonel Crawford secured a policy of life insurance in the amount of $10,000 payable to him, "his executors, administrators or assigns." December 2, 1899, he assigned the policy to his wife, and thus gave for enjoyment in futuro that which would have become hers otherwise and by operation of the will. This act, of course, is susceptible to explanation, the adequacy thereof being a matter for the jury's determination; nevertheless it has some probative value as indicating one or the other of two things: Colonel Crawford purposely did a useless thing, or he may have been then unconscious of the will executed six years previous.

March 19, 1910, articles were signed by Judge M. L. Crawford and Colonel Crawford in which adjustment of property rights was made as between them. Amongst the declared purposes is this:

"In order that our heirs may understand the true import and intent of this compromise and settlement we each acknowledge to the other its voluntary execution and put it in this permanent form so that when we are dead there shall be no occasion for a misunderstanding or controversy between our heirs, our assigns or our legal representatives."

The language selected and employed by these lawyers of great erudition, experience, skill, and ability, and pertaining to their own affairs, was deliberately used, it must be assumed, to import its exact legal signification. Neither the context nor any extrinsic fact modifies the word "heirs." Of course there were no heirs in præsenti, and there never could be any for Colonel Crawford except ab intestato. If a man once consciously executes a will and does not revoke it in a way provided therefor by law, an intention at any time to die intestate could not be presumed; perforce, if a person has manually executed a will and subsequently makes provision for an intestate death and no reference is then or thereafter made to the will, his conduct may be taken by a jury as evidence of lack of conscious knowledge of the will itself. Those facts (once established and proof of intervening insanity or such mental weakness as would account for lack of remembrance of so important a thing as a will being absent) reasonably gives support to one

or the other of two inferences: (a) Mental incapacity at the will's execution; (b) subversion of a mind inherently sound at the time. If mental incapacity (at that time) be otherwise disproved, the latter inference is the logical one.

[12-14] 7. Habitual subjection of one person to the control of another is circumstantial proof of a purpose to acquire and use undue influence. It is some evidence, too, of the acquest in reality. Goodloe v. Goodloe, 47 Tex. Civ. App. 493, 105 S. W. 533, 538; Clark v. Briley (Tex. Civ. App.) 193 S. W. 419; Rounds v. Coleman (Tex. Civ. App.) 189 S. W. 1086. And where actual opportunity to exert such influence in immediate connection with execution of the will is not precluded by other proof, habitual subjection becomes relevant to successful use of the influence at that moment.

In "6" above attention has been called to the fact that some of the incidents related by Missouri Baker may have occurred immediately before the will was executed, and that others may have occurred on the date of execution. The subject-matter of Colonel Crawford's statements, as related by this witness, was "what interest out of his estate he would leave to his children by his first wife." He would bring up the subject, she said, in the presence of his wife (contestee), and when he "would say what he was going to do for his children about the estate she would always speak and say he talked too much about that," and "shut it up." She would say to him: "You hush up; you talk too much about that." And "he wouldn't say a word when she would tell him to hush." The testimony of this witness is susceptible of a construction which would make it imply that Colonel Crawford, on such occasions, manifested a purpose to disregard the injunctions to "hush up," but it is susceptible, also, of an opposed meaning, and its true significance is for the jury. In any event, if Mrs. Crawford's words, as detailed by the witness, be given literal import, they might be taken as sufficient to show attempt to exert undue influence in respect to the will itself. And, as "an admissible circumstance under the issue," the fact and subject-matter of the conversations had at least as direct relation as did the "shipboard incident" detailed by Rose Hill, and held to be admissible in Scott v. Townsend, 106 Tex. 322, 341, 166 S. W. 1138.

Prior to (and after) the marriage on October 1, 1896, Colonel Crawford and his brother jointly owned a farm near Dallas. The proof tends to show that this farm was the source of (occasional) fuel, poultry, vegetables, and food supply for various branches of the family (including the separate household of Lucy), and that shortly prior to the marriage Colonel Crawford had ordered some wood to be sent (from it) to Lucy, and she had ordered some turkeys and chickens. On the date of the wedding, Mrs. Crawford, according to the testimony, declared (to Mrs. M. L. Crawford) that she "had countermanded the order." Upon return from the wedding trip she declared to Mrs. M. L. Crawford that she had told Colonel Crawford about countermanding the order, and that he had replied, "Madam, everything I have is yours."

The aged mother of Colonel Crawford had always been, at liberty to buy anything she might desire and to have it charged to the account of Colonel Crawford or to the firm account of Crawford & Crawford or to check on their bank accounts. According to the testimony of Mrs. M. L. Crawford, the mother was possessed of a set of china which she valued very highly. This set included some teacups and saucers, and one of the saucers became broken. Thereupon the mother sent her "nurse" to town in an effort to find and purchase a saucer to complete the set. Colonel Crawford's wife met the nurse on this trip, inquired and ascertained her mission, and ordered her to desist, saying to the nurse that she must not buy anything else for the mother upon her own order. This incident is said to have happened within "two or three years" of the marriage.

Colonel Crawford and his brother, Judge M. L. Crawford, had been partners in the practice of law for 20 or 30 years prior to the marriage and remained in that partnership for some years after the marriage. About three months after the marriage, according to the testimony, Colonel Crawford's wife declared to her sister-in-law that she desired the dissolution of this firm. In 1903, it is made to appear, she undertook to maintain a kind of espionage over conduct of affairs in the firm's law office. And (according to a declaration made by Colonel Crawford) he was unable to assist a niece (who was in straitened circumstances) to the extent that he desired to do for the reason that his finances were so closely watched by his wife that he could not do what he wanted to do." In 1913 (according to the testimony of Dr. Durrum) Mrs. Crawford declared that "she had the colonel to sever his connection with his brother." There is testimony in the record which might be taken as establishing the fact that Mrs. Crawford caused Colonel Crawford to make arrangements whereby his aged mother and other members of the family would not visit in his home.

The relations between Colonel Crawford and his brother, after the marriage, became strained to such an extent as that the brothers declined to speak to each other while gathered at the deathbed of their mother and at the funeral of their brother, Dudley. The estrangement appears to have followed dissolution of the partnership. According to Mrs. Crawford's statement to Dr. Durrum, she caused the dissolution. From this evidence, and the other facts and cir-

cumstances mentioned, a jury would have warrant to believe that, through subjugation of her husband, she contributed to the estrangement itself.

The power thus shown to have been acquired and used prior to and after and, maybe, on the date of the will cannot, as a matter of law, be given the character of due influence. It is for a jury to weigh the relevant evidence and say whether the influence it shows was due or undue. If it is thus found to be undue, the fact and the evidence by which it is proved is entitled to be considered as tending to establish use of a like influence as to the will itself.

[15] 8. Nondisclosure of material data may be circumstantially indicative of the truth of the adverse party's charge. The facts in evidence may disclose a duty to speak and impress upon silence an admissive character.

The honorable Court of Civil Appeals indulged this assumption:

·"The mind of testator at the time of the making of the will was neither weak nor wavering in decision and judgment, * * * but, on the contrary, at said time the testator was in full possession of all those mental powers that had enabled him to reach and hold an exalted position in his chosen profession of law."

But he may not have been "in full possession of all those mental powers" at "the time of the making of the will." The evidence discussed above (especially that mentioned in "2" and "6") presents bases for that hypothesis. Whether or not, in fact, there was anything abnormal in his "mental condition" at that vitally important moment is a proper inquiry about a material thing; and in respect to that exact matter the sole beneficiary, apparently, had exclusive knowledge. That this is true, also, as to all conditions by which writing and signing of the will were immediately circumstanced is a fair deduction from the record. Yet she did not speak, nor did the other contestee attempt to have her speak.

Silence, under the conditions disclosed, in our opinion, had some probative force as pointing to undue influence for a source of the will (M., K. & T. Ry. Co. v. Day, 104 Tex. 237, 243, 136 S. W. 435, 34 L. R. A. [N S.] 111; 22 C. J. pp. 111, 112, 115, 116; Sullivan v. Fant (Tex. Civ. App.) 160 S. W. 616),· and as strengthening the unfavorable inferences which the jury may have drawn from the other facts and circumstances.

There is an error of fact in that portion of the opinion of the Court of Civil Appeals wherein it is said that the peremptory instruction was given "at the close of the testimony offered by contestants." More than 66 pages of the statement of facts are filled with documentary evidence introduced by contestees before they moved for an instructed verdict. Hence, we do not have an instance belonging within the exceptional rule that "no presumption unfavorable to defendant arises from his failure to produce evidence peculiarly within his knowledge and possession," "when he introduces no evidence but submits the case on plaintiff's evidence." 22 C. J. 112.

9. The will which was before the court in Scott v. Townsend, 106 Tex. 322, 166 S. W. 1138, was executed September 29, 1909. The immediate conditions under which it was signed and published at Fort Worth, Tex., were affirmatively shown, and this included a showing that the person who was charged with use of undue influence was in St. Louis, Mo., at least for a period intervening September 23, 1909, and September 30th. There was no opportunity for personal contact between that person and the testator·in immediate connection with the will's execution, and no communication during the period was shown. But here the sole beneficiary may have been present when the will was prepared and signed; her absence is not shown and there is evidence (already pointed out) which indicates her presence (at or about that time) as one of the probabilities. Hence, Scott v. Townsend, in our opinion, supports the conclusions reached, to the extent that its doctrines are applicable at all.

[16] 10. The basic facts (interchangeably called "facts" and "circumstances") mentioned above are supported by testimony (whose truth we are required to assume) and by documentary evidence. By them, we believe, a jury issue is presented. We do not hold that any one of them, or less than all of them, is sufficient for that purpose; upon this we do not express or imply an opinion.

[17] 11. A circumstance shown by direct evidence is a fact proved and is not one·inferred. Our holding that it was for the jury, in the first instance, to say whether or not there was a successful exertion of undue influence does not mean that the ultimate finding may rest upon pyramided inferences.

We recommend reversal of the judgments of the district court and Court of Civil Appeals, and a remand of the cause for further trial.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted and will be entered as the judgment of the Supreme Court.

We approve the holding of the Commission of Appeals on the questions discussed in its opinion.