BINGHAM v. BINGHAM.

(Court of Civil Appeals of Texas. San Antonio. June 12, 1912. Rehearing Denied June 28, 1912.)

1. DIVORCE (§ 27*)—CRUELTY—PROFANE AND ABUSIVE LANGUAGE.

Mere profane and abusive language used by a husband toward his wife only once, or even at intervals, and not involving an attack on her chastity, is not such cruel and inhuman treatment as will justify a divorce.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 27, 62–83; Dec. Dig. § 27.*]

2. DIVORCE (§ 27*)—CRUEL AND INHUMAN TREATMENT—SITUATION OF PARTIES.

Where alleged cruel and inhuman treatment by a husband to his wife consisted of profane and abusive language, the enormity of the offense should be considered with reference to the environment and circumstances surrounding the parties and the atmosphere in which they lived.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 27, 62–83; Dec. Dig. § 27.*]

3. DIVORCE (§ 48*)—CRUEL AND INHUMAN TREATMENT—CONDONATION.

The doctrine of condonation applies as well to cruelty and other grounds for divorce as to adultery, except that the act of cruelty is condoned only until the particular act is repeated; the condonation, however, being conditional that the injured party is to be treated with conjugal kindness and consideration in the future, and, if this is not accorded, the former act of cruelty is revived, providing the last act is not produced by the offensive conduct of the party complaining.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 169, 170, 184; Dec. Dig. § 48.*]

4. DIVORCE (§ 130*) — GROUNDS—CRUEL AND INHUMAN TREATMENT—EVIDENCE.

In a prosecution for divorce, evidence of cruel and inhuman treatment held insufficient to justify a decree.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 442–445; Dec. Dig. § 130.*]

Appeal from District Court, Dallas County; Kenneth Foree, Judge.

Action by Fannie B. Bingham against Reese Bingham. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

Chas. F. Clint, of Dallas, for appellant. T. F. Lewis, of Dallas, for appellee.

FLY, J. This is a suit for divorce, custody of three minor children, the use of a homestead, and partition of community property, instituted by appellee. It was alleged that the parties were married in Tennessee in August, 1895, and had lived together as man and wife until about the time the suit was instituted, and that appellee had borne him three children, of the ages, respectively, of 15, 13, and 2 years. The grounds for divorce are stated as follows: "That in all of their married life, this plaintiff has conducted herself as a dutiful wife, but the defendant, ignoring his duty to plaintiff, has always been harsh and unkind, given to fits of ill temper, and continually harassing plaintiff with studied vexations and annoyances, saying many unkind and humiliat-

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

ing things, and doing many things to vex and worry this plaintiff. That plaintiff has long endured the harsh, cruel, and unkind treatment of defendant, hoping that some time he would realize the injustice of his actions toward her; but, instead of growing better, he has become worse and worse, until his conduct has at last become unendurable. That on or about September 1, 1910, without fault of this plaintiff, defendant flew into a violent rage, and with great violence seized plaintiff by the throat, and choked her and cursed and abused her, calling her the vilest and foulest names, and in the presence and hearing of her children. That the epithets and names applied to her by defendant were too vile for decent ears to hear, and plaintiff asked that she be not now compelled to repeat them. That, shortly before said time, plaintiff had been suffering greatly with bad and defective teeth, which needed the attention of a dentist, and defendant had given to plaintiff the sum of $13 to have some dental work done, and, acting upon instructions from him, plaintiff had engaged a dentist to do the work for her, and which had been by the dentist partly done, but not paid, and, upon said occasion mentioned, defendant took the money he had given her for such dental work away from her, and refused to let her have said work done and teeth fixed, by which she was caused to suffer great physical pain, and was greatly humiliated in having to tell the said dentist that she could not let him finish the work on her teeth and was unable to pay him for his said services. That after said time, and at times, the dates of which plaintiff is now unable to state, defendant would, without fault of plaintiff, curse and abuse her, applying the vilest names, and imputing to her a want of chastity in terms and words so vile and foul that plaintiff cannot repeat them, continually growing worse in this, till on or about September 24, 1911, again without fault or cause known to plaintiff, became angry, and cursed and abused plaintiff, and has at numberless times threatened to kill her, and has put plaintiff (in) fear of her life or great bodily harm from defendant. And this plaintiff believes that he will attempt to put his threats into execution, and on said dates has left defendant and has ever since remained away from him." The cause was tried without the aid of a jury, and a judgment rendered dissolving the bonds of matrimony, restoring the parties "to all the rights and privileges of single and unmarried persons," giving the care and custody of the children to appellee, and ordering the sale of the homestead for partition.

Only two witnesses appeared for the prosecution, appellee and her 14 year old son. She testified to her marriage in Tennessee, on August 18, 1895, and as to their removal shortly afterwards to Oak Cliff, Tex. She stated: "When Mr. Bingham was in a good humor, he has made a good husband; but, if he gets out of humor he is very ill and cross and disrespectful." She said he became angry with her in May, 1910, and was angry all summer, and did not allow her a penny during that time; that she was "comparatively without clothing," and he was in debt, and bills came in on the 1st of each month, and finally on September 1, 1910, he told her to have her teeth fixed and gave her $13 to have it done, and gave her $1 to buy coffee, and she went to town and had part of the work done on her teeth, and then went home and found that her husband had bought a lot of ammunition and was going hunting on "Labor Day," and she said to her husband, "Reese, child, I don't see how you can spend money for ammunition and go off and hunt and fish, and the bills coming like they are," and he said, "By God, he made the money, and he would spend it as he damned pleased," and grabbed appellee around the neck, and the oldest boy asked him to turn her loose and not hurt her, and he backed into the hall and picked up his gun and said he would kill the "whole damned business," and when the boy said, "You won't shoot me?" appellant replied that he would not. He then demanded a return of the $13 given to her for the dentist and cursed her, and she asked to retain $1 for coffee. She stated further: "I played like I could not find my pocketbook, and he turned and went through the house cursing and threw things around, and then the boy was so frightened, he undertook to help me find my pocketbook, and I motioned for him not to find it." She finally got the money and sent him all but $1, and he went off. She stated that all that summer he did not give his family a penny, and in considerably over a year she had only "two six-cent calico dresses and one pair of hose." She testified to numerous shortcomings of the husband during the summer of 1910, but no more outbreaks seem to have occurred until in the early part of September, 1911, which appellee describes as follows: "The occurrence that brought about the final separation, just before this suit was filed, was on a Friday; last Friday was three weeks ago. He had a niece that came and spent the day, and he had an idea—he wasn't there all day long, but he had an idea, or whether she told him, I don't know—that I didn't entertain her as royally as I could have done; but he didn't say anything that night, because he went to the depot with her and didn't come back until 10 o'clock. But the next morning he brought it up at the breakfast table, and he cursed me; and he had promised to bring me over here and get me some shoes. Hadn't gotten me any in two years. Hadn't given me a hat or anything— he was going to bring me that evening, and

he cursed me at breakfast table, and he says I was so God damned, infernal mean he didn't care, by God, if I never had another rag of clothes while I lived, and hadn't had any for two years, and I thought that was long enough to go without them, and he cursed me and said I was mean and dirty, and I was just everything, and both of the boys were at the breakfast table, when he began; but the oldest one left the table in disgust, and the youngest one sat there and listened. I just sat there and cried and didn't do anything. That was on Saturday, and he had $220; and he took that and his gun and left the house. I washed and ironed all day." On Monday she went to see her attorneys, and this suit was at once instituted. The 13 year old son did not testify, and the older one, about 15 years old, corroborated her to some extent, although in a modified way. He stated: "I think she was at the sink washing and he came in and commenced fussing around. He cursed her and called her names and took hold of her by the back of the neck. I think he tried to choke her. He threatened to shoot the whole business. He said he was going to shoot everybody that came on the place— shoot the policeman. I guess mother couldn't hardly do anything. I didn't do anything either. I told him I didn't want him to shoot anybody around here. He said he wasn't going to shoot me. He then put his gun down. There has been a good many times that he has cursed her. One morning at the table just before bringing of this suit, and I got up and went out and didn't hear none of it. I saw what was coming." The boy testified that his father got up and made the fires in the morning and would at times do the cooking morning and evening. He also stated that his mother would not speak to him for a week at a time, and during that time he would do the cooking. The foregoing was the testimony offered by appellee and upon which the divorce was granted.

Appellant testified that he had sent his children to school from the time they were old enough to go, that he was a carpenter and contractor, that he had earned the money and bought and paid for his homestead, that he gave his wife all the money he made, and that she bought everything the family needed. In this he was corroborated by several disinterested witnesses. She had credit all over the town. He stated that he did at least half the cooking and almost raised the baby. In this he was not contradicted and was corroborated in it. He told of an occasion on which he took the baby out on the street, when his wife came out of an alley and cursed him, calling him vile names, and then proceeded to call his mother, sister, and niece prostitutes, and he grabbed her by the shoulders, and when the boy asked him not to do it he de-

sisted and left. Appellee did not deny any of these matters, and in fact gave no adequate reason for the conduct of her husband. Appellant denied the gun episode, and stated that at no time except that mentioned had he ever laid his hands in anger upon his wife. He told about the disturbance which occurred about his niece which culminated in these divorce proceedings. He admitted that he was angry at the way in which his wife acted toward his niece.

Friends and neighbors of the family testified that they had heard appellee call appellant "a dirty, low-down dog," "a trifling scoundrel," and at one time she called him a "son of a bitch." Disinterested witnesses showed that appellee had charge of all the money and paid the bills. It was agreed by the parties that appellee could at her discretion procure what she wanted for herself and children, that she had unlimited credit, and that the bills were paid. Appellee swore that she had unlimited credit, and yet swore that she could not get any clothing or shoes for herself. She said she quit buying because "I had to; my conscience hurt me too much." What aroused the pangs of her conscience was not stated. One of her neighbors, Mrs. A. M. White, told of her talking about her husband; that she used profane language many times.

In divorce suits, as in all suits, the allegations and proof must correspond. In the first difficulty, which occurred in September, 1910, it was alleged that appellant seized appellee "by the throat and choked her and cursed and abused her, calling her the vilest and foulest names"; in fact, so vile that they could not be repeated. Appellee swore that "he flew at me and grabbed me around the neck and bore down on me," but did not testify that he called any vile names or that he choked her and cursed and abused her. That she was not at all alarmed at him appears from the fact that she made a mere pretense of hunting the money and would not let her boy hunt it. No one except appellee testified about her teeth. She alleged that her husband had imputed to her a want of chastity, but did not swear to it, nor did she prove any real threats made against her. She did not testify to one harsh word or one act of unkindness between September 1, 1910, and September 1, 1911, unless it was unkindness to prevent her from buying milk that was left open and exposed to germs upon which to feed the baby.

If appellee's version of the affair in 1910 be true, she provoked the difficulty by objecting to her husband spending his money for ammunition with which to go on a hunt; if his version be correct, she precipitated the conflict by the vilest abuse of his mother and sister. The more reasonable account, which is in some respects corroborated, is that of appellant; but in either event she brought on the difficulty. In such case she

is in no position to demand the dissolution of the marriage, the wrecking of the home, and the destruction of the family. For 12 months thereafter she lived with her husband, spent the money he earned, allowed him to care for and attend to the baby, cook the meals, and work for a living, and not an act of cruelty is charged against him during that time, and only when she had mistreated a niece of his and he became angry and talked rudely to her she went to an attorney and sought a divorce. With the money he earned in her hands, with credit in all the stores of the town, she swore that she could not get clothing for herself and children and tried to create the impression that her husband furnished her with little or nothing. All the facts and circumstances contradicted her on that subject. The evidence showed that appellant was a good provider and denied his family nothing his means could attain, and yet, in the face of it all, his wife would talk about him to the neighbors, applying the vilest and most offensive epithets to him. The profane language used by appellant cannot be excused or palliated; but it was no worse than that used by his wife, and it cannot be held to have been very offensive to a woman who used such language. In the interchange of profane marital compliments and courtesies "honors were easy."

He was not justified in laying his hands in anger upon the person of his wife; but the provocation, the acts, the language of the woman must be taken into consideration, and if, under the influence of sudden, uncontrollable anger, he did catch her by the neck or shoulders, she does not claim that any physical injury was inflicted upon her. It was only in that one instance that he ever laid his hands in anger upon her, and she did not consider that he had so treated her in that one instance that she could not live with him. She did live with him for a year, and she grudgingly admitted since that time he had not mistreated her. The outburst, the ebullition of passion for a few short moments in September, 1911, caused her to rush into a divorce court. There were no studied insults, no continued outbursts of passion, but a year intervened between them, and each time they were produced and fanned into a flame by the words and conduct of appellee. Loring v. Loring, 17 Tex. Civ. App. 95, 42 S. W. 644; Cunningham v. Cunningham, 21 Tex. Civ. App. 6, 53 S. W. 75; Bohan v. Bohan, 56 S. W. 959.

The Supreme Court of Texas has been more liberal, if it can be accounted liberality to be lax and easy in the granting of divorces, in permitting the dissolution of the marriage contract, on account of language used by the husband towards the wife, than many other courts, and the liberality has noticeably grown as the years have gone by. In the cases of Pinkard v. Pinkard, 14 Tex. 356, 65 Am. Dec. 129, and Sharman v. Sharman, 18 Tex. 521, it was held that charge of adulterous intercourse against the wife would not sustain a judgment for divorce; but in Bahn v. Bahn, 62 Tex. 518, 50 Am. Rep. 539, and Williams v. Williams, 67 Tex. 198, 2 S. W. 823, it was held that importing a lack of chastity in the presence of others was ground for divorce; but the Courts of Civil Appeals, now courts of last resort in divorce cases, have shown a tendency to narrow that doctrine and restrict its force. Loring v. Loring, herein cited; Luhn v. Luhn, 93 S. W. 525.

[1] The cases from the Supreme Court all refer to charges of lewdness and inconstancy; but we have seen no case where merely profane and abusive language used only once, or even at intervals, and not involving an attack upon the chastity of the wife, would justify the granting of a divorce. On the other hand, it has been held that in no cases have mere words alone been held to justify a separation from the bonds of matrimony. Scott v. Scott, 61 Tex. 119; Bush v. Bush, 103 S. W. 217; Eastman v. Eastman, 75 Tex. 473, 12 S. W. 1107.

[2] The evidence in this case must be viewed in the light of the environments and circumstances surrounding the parties. Language, which as between other persons, not necessarily having more wealth, intelligence, or education than the parties in this suit, but living in a different atmosphere with a different conception of the duties and amenities of married life, would be outrageous, and yet would be considered as an ordinary affair by those in the habit of using such language. Even bodily violence could not be viewed in the same light between one couple and as between another. And so in this case, where the wife seemed to use the same indelicate language as that used by her husband, it cannot be said to affect her as it would a woman who would not only shrink from using, but from hearing, such language. There was nothing, therefore, in the language used in September, 1911, that could have affected the delicate sensibilities of appellee, and there was nothing to arouse any fear of bodily injury. It did not arouse such fears, because there were no grounds upon which to base them. She claimed at times to have such fears, but her actions show that she did not. Even at the time appellant caught hold of her she had no fears for her safety, because she merely pretended to be hunting the money he desired, while at the same time concealing it. If the fear of bodily injury had been present in her mind, she would not have hesitated in delivering the money. She lived with him for 12 months afterwards, and in his very presence applied epithets to him far removed from terms of love and endearment. Fear does not so manifest itself. That one act of violence on the part of the husband was not such excesses, cruel treatment, or outrages as would render the living together of the couple insupportable. They lived together

for a year after it occurred, and there was no repetition of the assault, which inflicted no injury or pain to her person. More than all, the assault was the result of provocation upon the part of appellee. The evidence does not present the case of a loving, faithful wife assaulted by a brutal husband, but of one who was provoking in her language, whose inattention necessitated her husband performing household duties and even attending to the baby, and who was so disloyal as to talk about him to the neighbors in the most disrespectful manner.

[3] The evidence fails to show that there was a series of insults and cruel acts; but an act here and another there far apart have been seized upon by a woman who has developed such dislike for a man, who for 16 years labored for and supported her, that it has caused her to enter the courts to obtain an easy release from the bonds that have become burdensome and disagreeable to her. If there could be any condonation of the offense of her husband laying his hands upon her person in anger, it would seem that she had condoned it by living with him for 12 months thereafter, and the offense was never repeated. It has been held that the doctrine of condonation applies as well to cruelty and other grounds for divorce as to adultery; the difference being that an act of cruelty is condoned only until the particular act is repeated. Nogees v. Nogees, 7 Tex. 538, 58 Am. Dec. 78; Gardner v. Gardner, 2 Gray (Mass.) 434; Clague v. Clague, 46 Minn. 461, 49 N. W. 198; Sewall v. Sewall, 122 Mass. 156, 23 Am. Rep. 299. Of course, condonation carries with it the stipulation that the injured party is to be treated with conjugal kindness and consideration, and if this is not accorded the former act of cruelty is revived, provided the last act is not produced by the offensive conduct of the party seeking the divorce.

[4] This court is not satisfied that the evidence in this case meets the statutory requirement of being "full and satisfactory," based as it is upon the evidence of the wife and the young boy under her influence, not only uncorroborated, but contradicted by all of the disinterested testimony. The case has had a full hearing, presumably upon all the testimony obtainable, and the strife in the courts between the parties should be ended.

The judgment is therefore reversed, and judgment here rendered that appellee take nothing by her suit.