**GREENLAW et al. v. DILWORTH et al.**
(No. 978–4826.)

Commission of Appeals of Texas, Section A.
Nov. 23, 1927.

**1. Parent and child ⊜⇒2(4)—Court must view evidence in light most favorable to parent in determining custody of child.**

In determining custody of minor child as between parent and child's aunt who prevailed in Court of Civil Appeals, evidence must be considered most favorable to parent.

**2. Parent and child ⊜⇒2(4)—Evidence that mother had written and received erotic letters would not authorize court to declare her unfit for daughter's custody as matter of law.**

In a suit by a mother for the custody of her daughter, evidence that the mother had written and received, from a man other than her husband, erotic letters would not authorize the court to declare that, as a matter of law, the mother was unfit to retain custody of the child.

**3. Parent and child ⊜⇒2(4)—In suit by mother for custody of child, whether mother's use of intoxicants was excessive held for trier of fact.**

In a suit by a mother against aunt for child's custody, wherein it was shown that the mother indulged occasionally in intoxicating drinks, whether her use of intoxicants was excessive *held* a question for the trier of fact and not determinable as matter of law.

**4. Witnesses ⊜⇒414(1)—In suit for child's custody where mother defended charge of bad temper and language by accusing father of provocation, his silence thereon when subsequently testifying was corroborative of mother's version.**

In suit by a mother for the custody of her daughter where it was charged that the mother was unfit as a custodian because of her bad temper and her use of abusive and profane language, and where the mother defended such charges by accusing her former husband, the child's father, of provocation by like faults, *held*, that his silence thereon when subsequently testifying was corroborative of the wife's statements.

**5. Parent and child ⊜⇒2(4)—Bad temper does not, as matter of law, disqualify offending mother as daughter's custodian.**

The fact that a mother has a bad temper does not, as a matter of law, disqualify her from being a fit custodian of her daughter.

**6. Parent and child ⊜⇒2(4)—Mother's abusive language does not, as matter of law, disqualify her as child's custodian.**

Abusive language and the character or traits which its use may evidence does not, as a matter of law, disqualify the offending parent for custody of child.

**7. Parent and child ⊜⇒2(3)—Recrimination of husband and wife in divorce suit may be considered on question of their child's custody.**

The matter of recrimination of the father and mother in a divorce proceeding may be considered in a subsequent controversy relative to the proper custody of their child, as between the mother and a third person; there being an indissoluble connection between divorcement and custody or welfare of children.

**8. Appeal and error ⊜⇒909(1)—On review of judgment awarding custody of child, as between mother and aunt, court must assume, in absence of contrary showing that divorce between parents was on statutory grounds.**

Reviewing court was required to assume, in absence of record's showing otherwise, in suit by mother for custody of child opposed by child's aunt, that parents in divorce action averred statutory grounds for divorce.

**9. Divorce ⊜⇒172—Final decree awarding custody of child in divorce action made custody res judicata as between parents.**

Where in a divorce proceeding the custody of the parties' child was awarded, *held*, that such final decree made the matter of custody res judicata between the parents.

⊜⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**10. Parent and child ⬦⟿2(3)—Child's welfare is superior and comprehensive test of custody.**

The welfare of the child is the superior and comprehensive test in the matter of who should have custody.

**11. Parent and child ⬦⟿2(4)—To remove child from parent to whom custody has been awarded, positive disqualification for custody must be shown.**

When custody of a child has been awarded to a parent, one seeking to remove the child from the custody of such person has the burden of showing positive disqualification of such parent for custody of child.

**12. Parent and child ⬦⟿2(4)—Evidence did not show, as matter of law, that mother's character was such as to render her unfit custodian of child.**

Evidence *held* not to show, as a matter of law. that the character of a mother, to whom custody of her infant daughter had been awarded, was such as to render her an unfit custodian and that custody of child should be awarded to another.

**13. Parent and child ⬦⟿2(4)—Evidence held not to show, as matter of law, that financial condition of mother rendered her unfit custodian for child.**

In a suit by a mother for the custody of her infant daughter, opposed by daughter's aunt, evidence *held* not to show, as a matter of law, that the financial condition of the mother was such as to render her an unfit custodian of the child.

Error from Court of Civil Appeals of Fourth Supreme Judicial District.

Suit by Mrs. Terry Greenlaw and husband against Mrs. R. S. Dilworth and others. A judgment for plaintiffs in the district court was reversed, and judgment rendered by the Court of Civil Appeals (291 S. W. 331), and plaintiffs bring error. Judgment of the Court of Civil Appeals reversed, and cause remanded.

Hertzberg & Kercheville, of San Antonio, for plaintiffs in error.

Clamp & Searcy, of San Antonio, for defendants in error.

NICKELS, J. The case is generally stated in the opinion of the Court of Civil Appeals. 291 S. W. 331. It was brought to the Supreme Court upon assignments challenging jurisdiction in the Court of Civil Appeals to render final judgment contrary to that of the trial court.

A Court of Civil Appeals "may draw from the evidence conclusions of fact different from those arrived at by the jury or judge, and it may reverse the judgment of the lower court and remand the cause for the reason that it thinks the verdict and judgment to be against the weight of the evidence, but the determination of questions of fact as the basis of a final judgment involves the exercise of original jurisdiction which has not been conferred upon the Courts of Civil Appeals." H. & T. C. Ry. Co. v. Strycharski, 92 Tex. 1, 37 S. W. 415; Choate v. S. A. Ry. Co., 91 Tex. 406, 44 S. W. 69; Sprinkles v. Kerbow (Tex. Com. App.) 279 S. W. 805, and cases there cited.

The evidence is not stated, even by way of summary, in the opinion of the Court of·Civil Appeals; it is there dealt with only in the manner of general ultimate conclusions. Nor did that court make finding upon preponderance or sufficiency of evidence, as was done in Sprinkles v. Kerbow, supra. Judgment awarding final relief was rendered by that court, and this involves a finding that the evidence tends in one direction with that conclusiveness which leaves no ground for combat of rational minds. The situation thus projected gives rise to our duty to examine the entire record and therefrom to ascertain, with the aid of relevant formularies, whether there be that cogency of proof which is the postulate of the final award.

[1] Because there is much in seeing a witness (H. & T. C. Ry. Co. v. Gray, 105 Tex. 42, 143 S. W. 606) and because in general credibility does not lie outside the range of the jury function, we must, of course, accord verity to whomsoever may have spoken a word in favor of the party who finally lost and allow to the primary trier of facts his full liberty to believe or disbelieve as he might rightly choose, those speaking with contrary import. Our duty, too, requires that the evidence be considered with remembrance of the special nature of the case and in the view most favorable to the loser.

## I. Conjugal Infidelity.

There is in the proof no evidence of unchastity. The sole evidence of infidelity in its milder senses is the supposed fact and subject-matter of certain correspondence mentioned by the Court of Civil Appeals as being "letters" "filled with erotic protestations and revealing that they were constantly replied to in the same spirit, at a time when the marital relation existed between" the lady who is now Mrs. Greenlaw "and Elliott Jones." There are five of the purported "letters," with dates in March, April, and May, 1921. For immediate purposes the statement of the Court of Civil Appeals may be accepted as a sufficient description of the "letters"; they certainly bear no interpretation more adverse to Mrs. Greenlaw.

The evidence about the "letters" is peculiarly circumstanced. Mrs. Greenlaw's connection with the correspondence in any form is not otherwise established than by the testimony of Belle Williams, a negro ex-servant, who appeared as a witness for Mr. Jones and

Mrs. Dilworth. Her testimony by deposition was first introduced. A paragraph of the deposition, as reproduced in the statement of facts, reads thus:

"The witness was asked it she ever found any letters there on the place written to Mrs. Jones by men, and replied that she had seen letters around there. I never read any of those letters, nor do I know who they were from."

There is in the deposition no other reference to "letters." Subsequently the witness appeared and testified. She declared:

"I did not have those letters when I testified by deposition, and I did not say anything about letters then."

Other important references were these:
(a) On direct examination:

"I always had to clean up the house, and I found them in the wastebasket" (in Mrs. Jones' room) "and why I kept the letters was because Mr. Jones told me, that is the reason I kept them."

(b) On cross-examination:

"I kept them to protect myself, because Mr. Jones often said to me, 'If you ever say anything and can't prove it'—Mrs. Jones did not tell me to keep the letters, but I kept them of my own accord. I just took it on myself to keep them because I thought if anything like this would come up I would have those letters to protect myself about things I had seen sometimes. I did not go to Mr. Jones and tell him that I had the letters, and I do not know how he knew about it; the first time I showed Mr. Jones the letters was not long ago; he came out to my home and asked me if I had some letters that I had found of Mrs. Jones, and I told him, 'Yes,' * * * and I gave them to Mr. Jones."

Mr. Jones testified that he did not know of the "letters" until he got them from Belle Williams a short time before the trial. Mrs. Greenlaw testified in general denial of any correspondence with the supposed author of the "letters" "in the sense inferred"; that testimony being given prior to introduction of the "letters," and, so far as the record shows, before she had opportunity to examine them; after the "letters" were introduced she did not testify on any point. Mr. Jones testified generally after Belle Williams' deposition had been read and after she had testified in person, but he made no specific denial of or reference to Belle's declaration that "why she kept the letters was because Mr. Jones told me to."

That one whose business it is to accredit or to disbelieve a witness might properly regard Belle Williams as contradictive of herself and of Mr. Jones and of Mrs. Greenlaw becomes manifest. In the first place, she "did say something about letters when she testified by deposition," although personal appearance as a witness was accompanied with a denial of that fact. In the next place,

she gave contradictory reasons as to why she kept the letters; she "kept them because Mr. Jones told her to do so," but she "kept them of her own accord"; she had never read the "letters,' yet she kept them for her own "protection." In the third place, she did not know how Mr. Jones came to know about them, yet she kept them originally because he told her to do so. In the fourth place, Mr. Jones knew nothing of the letters until shortly before the trial, according to his testimony, but according to Belle she kept them because he told her to do so. And in the fifth place, Mrs. Greenlaw's testimony may be taken as a circumstantial denial of Belle's declarations that she found the letters in the wastebasket mentioned at a time when Mrs. Greenlaw (then Mrs. Jones) told her to empty the basket and destroy the "trash." Credibility thus became substantially issuable with the result that a trier of facts might disbelieve the witness in the whole or in respect to any of her testimony. If she were entirely discredited, the "letters" as evidence would depart from the case.

But in the failure of Mrs. Greenlaw to make specific denial of the particular correspondence and in the failure of Mr. Jones to deny Belle Williams' statement that he told her to keep the "letters" there is possible corroboration of some of Belle's testimony. M., K. & T. Ry. Co. v. Day, 104 Tex. 237, 243, 136 S. W. 435, 34 L. R. A. (N. S.) 111; Craycroft v. Crawford (Tex. Com. App.) 285 S. W. 275, 280, 281. There arises, then, the hypothesis of belief (a) in Mrs. Greenlaw's connection with the "letters," and (b) of Mr. Jones' knowledge of that fact and of the contents of the letters acquired several years before the trial and even before the divorce proceeding. We make the latter statement because, in so far as time is identified, Belle Williams merely indicated her discovery of the letters as being in the ordinary course of household duties, and, in consequence, a trier of facts could allocate that time and the time that Mr. Jones instructed keeping of the "letters" to some date near their receipt by Mrs. Jones. Scott v. Townsend, 106 Tex. 322, 341, 166 S. W. 1138; Craycroft v. Crawford, supra. That hypothesis wears a double mien. (a) Mr. Jones with knowledge of the fact of correspondence, under the circumstances, would have at least imputed knowledge of the subject-matter, and with that knowledge there was silence for a considerable time (maybe, 4 years and 5 months). With the generality and indefiniteness by which the contents of the "letters" is marked in view, a trier of facts might justifiably believe that Mr. Jones, with superior opportunity to judge, construed the matter and regarded the significance as being of import much different from the meaning lately sought to be given. And, too, condonation and its effect would project itself. (b) There

is no suggestion that any correspondence or communication of any sort took place, between Mrs. Jones and the supposed author of the "letters" after May, 1921, or that any comparable relation existed between her and any other man at any time. Hence in the general posture there was locus pœnitentiæ, as in general there ought to be lest a juror or judge mock the spirit of philosophy, deny the efficacy of aroused conscience, and admit the invincibility of sin. If Mrs. Jones was guilty of the indiscretion or the vice, according to breadth of view, lapse of time without recurrence of the same or like conduct vouchsafed to her the benediction of reformation invited and actual.

[2] Mrs. Greenlaw, it is to be remembered, was not being tried upon a charge of participation in that correspondence. The matter is evidentiary as relevant to the broader issue whether she be fit to remain in the full and absolute sense the mother of her girl child. As presented, and in any view, evidence touching the incident of itself has no warrant for her condemnation, as a matter of law.

## II. Excessive Use of Intoxicants.

Mrs. Greenlaw testified that she had never been intoxicated, but that on occasion, usually at formal dinner parties, she would drink a cocktail. Except with what are described as the other ingredients of a cocktail, she had never tasted liquor, she said, except, possibly, on one or two occasions. There is in the record no direct refutation of her statement on the subject, and circumstantially there is but the fact that the negro servants (according to their testimony) occasionally, usually after "parties" in the home, would pick up and dispose of empty bottles, some of which may have formerly contained liquors, and one of them saw her take a drink of something from a bottle one time. Mr. Jones, with 10 years' opportunity to know something about what Mrs. Greenlaw's conduct was, made no reference in his testimony to the subject of her use of intoxicants, although in the pleading he had made the charge. Belle Williams, one of those servants, has been mentioned already, and the observations made in respect to her testimony about the "letters" are sufficient to indicate some liberty in a trier of facts to accord inferior weight to her testimony on any phase; and he would be at complete liberty to disbelieve the other servant, Effie Guyton, not because she is a negro and an ex-servant, but because she admitted that, while "she would not say she lied, she did not tell the truth" touching an important matter and because in a permissible view Iago has silhouette.

[3] An issue touching excessive use as contrasted with mere use presents at once obvious ground for intellectual war, save at least instances of extreme aggravation. Barring an exceptional case, the issue is intrinsically one of fact, in the resolution of which the judgment of one man is about as good as that of another. N. W. Mut. L. Ins. Co. v. Muskegon Nat. Bank, 122 U. S. 501, 7 S. Ct. 1221, 30 L. Ed. 1100; Ins. Co. v. Foley, 105 U. S. 350, 26 L. Ed. 1055; Schon v. Modern Woodmen of America, 51 Wash. 482, 99 P. 25, 27.

It is not our business to say whether the evidence in this record is sufficient to raise an issue of excessive use of intoxicants; what we do say is that it goes no further.

## III. Temper—Abusive Language—Profanity.

*A. The Facts.*—Mr. Jones apparently had opportunity throughout the 10 years preceding the divorce to know what there is to be known of Mrs. Greenlaw's traits and conduct in the respects now under consideration. His summarized estimate is that "when crossed" she has just about as bad a temper as a person could have, making her "scream and holler," "fall down and kick," and "fight." His thought is that when she gets into one of these "tantrums" she loses "temporary reason" and "has no respect for time, place or circumstances." He generally indicated that she would not refrain, even though the child were present. It will be noted that Mr. Jones himself conditions whatever outbursts there were upon Mrs. Greenlaw's being "crossed," and he does that without at all describing or illustrating what he meant by "crossed"; in other words, his testimony imports the idea of provocation of some undisclosed degree and character. In the general sense, and so far as the record discloses, his general estimate is somewhat cut down and the nature of the provocation supplied in the version given by Mrs. Greenlaw:

"As to whether or not it is true, that I indulge in cursing and profanity when I get angry, * * * I will say that probably at times I have called Mr. Jones names when he called me everything in the English language. I have probably called him a 'damn fool.' Women do not take cursing for years and not retaliate. I think my nurse heard me call him a fool one night when he pushed me down the stairs. There was no person outside of those living in our house—no outside parties ever heard me use that language. I don't use profane language. * * * I do not scream when I get angry."

[4] This testimony was given by Mrs. Greenlaw prior to the time that Mr. Jones took the witness stand. He did not specifically deny or particularly make reference to Mrs. Greenlaw's implication that he "called her everything in the English language," "cursed her for years," or her statement that "one night he pushed her down the stairs." His silence made up a circumstance corroborative of Mrs. Greenlaw's version. M., K.

& T. Ry. Co. v. Day, supra; Craycroft v. Crawford, supra.

. Belle Williams, the witness above mentioned, thus summed what she heard, etc., when Mr. and Mrs. Jones "would have any disagreement":

"She fussed at him sometimes. As to what she did say, I will say I could not remember—'undergrowth,' something like that. I don't know what that means except a little man. She would call him 'undergrowth' or something like that. * * * As to the language she would use toward him, I will say she said, 'Damn it,' sometimes. I do not remember her saying anything worse than 'Damn it.' "

Effie Guyton, another household servant, being asked as to Mrs. Jones' disposition "with reference to her being of a quiet, peaceful sort of woman, or inclined to get angry and raise Cain," said that "sometimes she would get angry, and sometimes she would not." She added:

"When she got angry with Mr. Jones she would cry, go out of the room, fall down on something and cry. * * * As to whether or not I ever heard Mrs. Jones curse Mr. Jones, I will say I don't know, just to come out and curse him. I have heard her say some ugly things to him, but I just don't remember her saying the Lord's name, and I don't ever remember hearing her say a bad curse word. * * * I have heard her say such words as 'fool.' I don't know that I have heard her use worse words than 'fool.' * * * As to whether or not Mrs. Jones would fuss at the child, I will say that she would not fuss at her. * * * I never saw her try to strike him," etc.

[5] With an exception to be noted, the balance of the testimony about temper, abusive language, and profanity has reference to three defined occasions, subsequent to divorcement from Mr. Jones (December, 1924) and prior to October, 1925. According to Mr. Jones, one of the "occasions" (rather, like conditions) had "often" repetition in that period. All of this testimony is thus circumstanced: (a) It was given in large part by Mr. Jones, in substantial part by his near kinsmen, in substantial part by his employees, and in the small remainder, by his close personal friend. (b) Some of it has specific refutation in the testimony of Mrs. Greenlaw and much, or all, of the balance has the general contradiction imported in that part of her testimony excerpted above. (c) In respect to each occasion there is testimony in which a trier of facts might properly find substantial provocation.

B. *The Law.*—A reasonable creature in being without passion would be taken, we suppose, as something either more or less than human. Potential wrath at least is a sine quo non of admirable personality. There is moral and philosophical advice of slowness to anger—and it has civic aspects, yet this does not preclude (contrarily, it presupposes) rightful ire on appropriate occasion.

What is the minimum requisite to good character and the maximum which that character includes are problems for which the law supplies no exact or even approximate answers. About all that can be certainly known is that a person without resentment and one with that distemper which is (or which nears) insanity belong with the other abnormalities. In Sheffield v. Sheffield, 3 Tex. 79, 87, the offer of "a few short words and occasional sulkiness" with "petulance" as grounds for divorce is characterized as "preposterous," and a verdict based on that proof is said to be "flagrantly wrong." In Martin v. State, 90 Ala. 602, 7 So. 858, 24 Am. St. Rep. 844, wherein the character of the deceased became relevant, it was held that proof of a "good boy" had no tendency to disprove his "violent temper"; that is to say, a good boy might have a violent temper and a bad boy might have a mild temper. Even the taking of life has some general mitigation in a great ire resting in adequate cause. Where, as here, welfare of a child is the basic issue, there is an undefined margin of difference between "character" in its most general ranges and "fitness"; yet, since a proper amount of temper is essential to good character, a proper amount of it is likewise requisite in appropriate guardianship, and the difference, whatever it is, has relation to what is the right amount in the particular situation made by all the evidence.

Temper is internal. Its existence in some degree naturally is to be presumed. But its measure, in a given case, can be but imperfectly secured, and that only through deduction based on knowledge of such particular words and acts as are generally thought to evidence the quality. And two things, at least, inhere in any test: (a) The fact that a person may get mad on occasion is not proof of weakness or degeneracy, for it may as easily be a mark of strength; (b) some knowledge of the conditions by which any outburst is circumstanced is an essential predicate. Given language or conduct taken separately might well exhibit a too violent temper, yet, if there be provocation and it be known, the act or word might as well be thought exactly appropriate to the occasion, or maybe less than what would be justified. Vide Bingham v. Bingham (Tex. Civ. App.) 149 S. W. 214, 217.

[6] In the homely adage (Sheffield v. Sheffield, supra), "Hard words break no bones." Mere abusive language employed by one spouse, save imputation of unchastity by the husband, is not generally regarded as sufficient to justify disturbance of the natural placement of parent and parent and parent and child. The exceptional case is made up that studious and persistent abuse which may be a contributing cause of impaired health, Scott v. Scott, 61 Tex. 119; Eastman v. Eastman, 75 Tex. 473, 12 S. W. 1107; Bush v. Bush

(Tex. Civ. App.) 103 S. W. 217; Bingham v. Bingham, supra. Camp v. Camp, supra, and Bush v. Bush, supra, illustrate the general rule, and Eastman v. Eastman, supra, the exception. Even in the exceptional cases, it will be noted, abusive language and the character or traits which its use may evidence does not, as a matter of law, disqualify the offending parent for custody of the children. The trial court, in Eastman v. Eastman upon sufficient evidence found that the husband "was generally unkind" to the wife "and habitually addressed her in an unfeeling and insulting manner, and with oaths." Upon that and other findings the Supreme Court held "that a divorce should be granted." Nevertheless, since the custody of the child was involved, "the cause was remanded for the purpose of making "such orders in regard to custody * * * as the testimony upon that issue may warrant."

[7] There is precept that grievous words stir anger. Hence in the law of domestic relations recrimination (Sheffield v. Sheffield, supra; Hale v. Hale, 47 Tex. 336, 26 Am. Rep. 294; Jones v. Jones, 60 Tex. 451; Beck v. Beck, 63 Tex. 34; McNabb v. McNabb [Tex. Civ. App.] 207 S. W. 129; Tanton v. Tanton [Tex. Civ. App.] 209 S. W. 429; Wiedner v. Wiedner [Tex. Civ. App.] 231 S. W. 448) finds its place. That, of course, includes a species of provocation, and its direct relation is to the matter of divorcement. Yet it goes further. There is an indissoluble connection between divorcement and custody or welfare of children, and the effect of recrimination may not be wholly denied in such a case as this without repudiating the justice and wisdom of its influence as exertable in the problem of determining whether a given offending parent is a fit associate for his or her conjugal partner. Divorce may be denied and custody left where nature put it despite ample proof of temper as marking each parent.

Profanity may or may not be a concomitant of wrath. There are people who appear to swear purely for the love of it, and we suppose there is more blasphemy in that kind of profanity than in such as comes only with aroused temper. It is with the latter class we have to deal, for the record is without suggestion that Mrs. Greenlaw used a blasphemous word save in anger.

There is a general warning of high source against profanity of any kind, yet it is addressed primarily to moral agency and but secondarily, if at all, to citizenship. The range of its civic aspects, so far as steadfastly marked out, is rather narrow; e. g., a misdemeanor is committed if a person curse in or near a public place or private residence (of another) "in a manner calculated to disturb the inhabitants" (article 474, P. C. 1925), or swear in conversation by telephone (article 476, Id.; Mercer v. State, 52 Tex. Cr. R. 321, 106 S. W. 365). In the matter of divorcement

with its incidence upon children, profanity itself or in emphasis of abusive language is not regarded as sufficient for a decree unless, perchance, in the exceptional cases described in Scott v. Scott, Eastman v. Eastman, etc., supra. And, it will be noted again, in Eastman v. Eastman the fact that a husband "habitually addressed" his wife "with oaths" did not preclude further inquiry about his character, etc., in relation to the child's welfare.

The posture given the matter by the evidence as stated by us—as in fact by any possible statement of it—and read in the light of the general principles noted, obviously includes the issues of substantial provocation and recrimination in mitigation, if not in justification, of all that is charged to Mrs. Greenlaw on the score of temper, abusive language, and profanity. This precludes all warrant for a hard and fast ruling that this lady is more sinning than sinned against, or that her temper and supposed tendency toward blasphemy is at war with requisite character.

It is noticeable that the latest exhibition of temper, etc., thus far shown occurred in September, 1925—some 13 months before the trial. Effie Guyton was a servant in the household of Mrs. Jones (later Mrs. Greenlaw) up, to a date near the trial. She appeared as a witness against Mrs. Greenlaw and with such demeanor as to justify a trier of facts in the belief that she was willing to go to the adverse extreme. Yet she mentioned but one exhibition of temper by Mrs. Greenlaw during the 13 months mentioned. Her testimony on that point was contradicted by that of Mr. and Mrs. Greenlaw. Too, in a deposition previously taken, she had substantially denied knowledge of any such occurrence as was related from the witness stand. Confronted with that denial in the cross-examination she naïvely declared that she "wouldn't say she lied, but that she did not tell the truth." A trier of facts, naturally, might have refused credit to the witness, and if he did so Mrs. Greenlaw would then appear entirely free of any charge of manifestation of excessive temper at any time since the provocation of the ex parte order. Except for the testimony of that witness in the one respect mentioned, the union between Mr. and Mrs. Greenlaw appears a happy one; and the view that with normal environment the traits now being considered are but normal traits is not precluded. Another fact hypothesis is that of a mended and conquered temper.

### IV. Divorcement.

[8] In the fact of divorcement, as it is presented in this record, there is no evidence conclusively adverse to the mother. That suit was filed by Mr. Jones; Mrs. Jones resisted the charges and upon cross-action

(299 S.W.)

sought a decree, which was granted. The nature of the charges and countercharges is not here disclosed, but in consonance with familiar principles it must be assumed that each party averred statutory ground for divorce. In the decree (rendered upon evidence heard) it is recited that Mr. Jones' allegations are found to be untrue, and that Mrs. Jones' charges are found to be true, and decretals in harmony with those conclusions follow. To one exercising the jury function, then, this matter might well appear in dual aspect: (a) A compliment rather than character stain for Mrs. Jones, for she had been tested and innocence justiciably proclaimed; (b) the husband who now advances grave charges had once done likewise and had met the repulse of adjudicated untruth.

The circumstance of divorcement, as it is portrayed in the record, has a possible relation to the credibility of Mr. Jones and to that of Mrs. Greenlaw and might be taken by a trier of facts as exerting substantial weight in the right solution of the questions in respect to which their testimony differs.

### VI. The Claim of the Father as Such.

. [9] Whatever priority of right came to Mr. Jones with fatherhood became vested in Mrs. Jones (later Mrs. Greenlaw) by operation of the decree of December 27, 1924, awarding her divorce and custody. Of that matter the court had jurisdiction and the decree as between the parties became res adjudicata. Wilson v. Elliott, 96 Tex. 472, 73 S. W. 946, 75 S. W. 368, 97 Am. St. Rep. 928. This effect is not lessened by actual or potential reopening through habeas corpus of the matter of custody, for in that case the welfare of the child as contrasted with the rights of any and all others is the subject of inquiry and disposition. Hence the fact of Mr. Jones' fatherhood exerts no force to displace or reduce the burden of proof to be mentioned.

### VII. The General Nature of the Issues—Burden and Character of Proof.

The law regards as sacrosanct that moral agency which comes with a man's being from the Creator, and, so far as may be, avoids its definition as precedent to extrinsic force. It adores the great Source of man's strength and looks with compassion upon his weakness. Seeking justice and yet that attribute which tempers, it strives to confederate the whole of experience and the sum of wisdom in its tests and in its formularies of proof. In the one aspect as in the other more than an unfavorable surmise is required. In all the relations with which it deals something more than what would be expected from the brute is required, but that which would be the result of omniscience and perfect goodness is not the standard of conduct anywhere. Setting the pedestaled automaton

299 S.W.—56

and his colorless perfection with the hypercritic and his mouthings at one end, and the dolt with his idiocy and the degenerate with his perversions at the other, the law from the median range takes the average man and his humanity as the practical ideal for its subjects. Substantive tests rest upon the postulate of occasional lapses resultant of the imperfections and inconsistencies to which the ordinary man seems heir.

And, so, in the means and measures of proof by which the standard of conduct is applied, account is taken of man's propensity to err. The measure inevitably requires more than basis of suspicion as the irreducible minimum (Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059), and the means have regard for the myriad influence which may impair accuracy. Othello is not to judge, nor may he be an accredited witness; the general repudiation which his rules and measures have endured acquires peculiar significance in jural weighing of character and a still more especial importance where the inquiry pertains to moral fiber determinative of a mother's privilege of rearing the child of her body.

The standard of conduct and the evidentiary formulæ in such a case commonly allow, in deference to manhood and womanhood, a favorable presumption. A rightful corollary is that apparent exhibition of vice ought to have reconciliation with innocent purpose and good character if that be reasonably possible. 10 R. C. L. 875, 883.

In the case of a mother and her child's custody there is a supplemental postulate of fitness. State v. Deaton, 93 Tex. 243, 54 S. W. 901. Entitlement to that consideration she brought from the Valley of the Shadow. The presumption, of course, is most cogent when peace more than bickerings and backbitings and permanent union rather than the catastrophe of divorcement mark the relations of the parents; yet it persists—maybe with attenuated strength—in a situation such such as that with which we have to deal. It is so, we think, because God, as we dare know Him, made it so, and man, barring the soviet and ancient exemplars, has not as yet pronounced fiat of different import.

[10, 11] It is true that the child's welfare is the superior and comprehensive test of custody. Rice v. Rice, 21 Tex. 58; Legate v. Legate, 87 Tex. 248, 28 S. W. 281; State v. Deaton, supra; Castro v. Castellanos (Tex. Com. App.) 294 S. W. 525; Edwards v. Edwards (Tex. Com. App.) 295 S. W. 581; Cecacci v. Martelli (Tex. Civ. App.) 235 S. W. 951; Davis v. Elkins (Tex. Civ. App.) 249 S. W. 1099. But the presumptions noticed mean that in general the child's welfare and the parent's fitness commonly rest in the natural relation which may not be disturbed save by that rebuttal which exhibits positive disqualification of the parent. State v. Deaton, supra; Legate v. Legate, supra;

Weir v. Marley, 99 Mo. 484, 12 S. W. 798, 6 L. R. A. 672; State v. Richardson, 40 N. H. 275.

He who seeks that rebuttal naturally assumes the burden of proof. And the question whether the burden be discharged is much affected by the pecularities with which the subject-matter is characterized—some of which may well be noticed.

Character being wholly subjective, the best evidence available in any case will be nothing more substantial than deduction, and that, too, about a matter whose nature utterly precludes the application of scientific formulæ and expert skill. If the proof be that of general reputation, it is but partial reproduction of the conclusions drawn by members of the community, and thus the final deduction is two degrees removed from the supposed (yet undisclosed) facts upon which rests the first; if it take the form of disclosure of particular acts and words, the trier of facts can but reason about their significance; in either case there is possibility of illogic, and in the first, on the part both of the members of the community and the trier of facts.

Whether proof take the one form or the other, or both, it will be true that in the ordinary span of life there are multiplied thousands of acts done and words spent of which each member of the community whose view contributes to reputation or the ultimate judge passing on specific acts or words will know nothing; those which are unknown, in significance of personal character, may be wholly at war with what is known or afford that explanation of what is known which would greatly alter, if not entirely destroy, the apparent meaning. Too, character is the sum of all traits, of which there are many, and amongst which there is much overlapping, while in a given case (the present, for example) such evidence as there may be will have reference to a few. If the evidence tend to show a few bad traits, the others which complete the personality are to be taken (account of the presumptions mentioned) as good, and thus that balancing of good and bad which ordinarily makes a fact issue is required. So long as he be denied omniscience and omnipresence, a man, when he comes to judge his neighbor's moral worth, will have, at best, but the poor aid of imperfect knowledge of but a fragment of the relevant fact, which, in its true sense, would include all that his neighbor had said and done from the beginning.

The possible influence of personal bias is obvious. And not less so is that of community bias or predilection. Geography tenders its contribution. Conflicting police regulations, embodying mass thought, as they contemporaneously obtain in various parts of the world, and possibly in adjoining provinces, illustrate the fact that a man may be judged good, while across the boundary line his twin in physique and ethics may be held bad.

And time has its effect. An example arises in the conflict of police regulations of different periods in the same community. Solomon, we imagine, was an accredited citizen, yet he or David likely would have suffered if lately tried on good character.

With an issue drawn as to present and future character, the proof (whether by general reputation or by exhibition of acts and words) will have a backward relation. A man may have done an act or by word manifested a thought on a day or on recurring days, and that may import a probability of like act or like thought on a subsequent day or in the future, but it would be extremely unphilosophical thus to establish the inevitable fact of subsequent and still future conduct or state of mind.

[12] We have indicated existence of fact issues made in respect to each trait of character supposed to be bad and to which the evidence was directed. But if each of those issues were taken as established against the mother, the findings would be preliminary and evidential and the issue would yet remain whether disqualifying unfitness exists. What has been said about the presumptions and the inherent characteristics of whatever proof there may be in rebuttal suggests that in most, if not in all, cases the ultimate fact is issuable. There may be instances wherein it can said, as a matter of law, that the duty of proof has been observed to that point warranting adjudication of bad moral character, but this is not one of them.

## VIII. Comparative Wealth.

[13] Poverty short of want and wealth above requirements of ordinary comfort may equally be 'a blessing or a curse in relation to the welfare of children as in respect to the life of adults. At least within the median range, there is utter rejection of available worldly possessions as the measure of a child's welfare or as the test of a custodian's worth. Legate v. Legate, supra. Mrs. Greenlaw and husband protest their financial ability and their desire properly to raise and educate this child. The husband is a lieutenant in the air service of the United States with whatever salary is attached to the position. Defendant in error Jones is obligated to pay Mrs. Greenlaw, as noted, $300 per month for a period of 10 years (beginning January 1, 1925), and $60,000 at the end of the period; he has defaulted in payments since June, 1926, because, he said, business collapsed and he has no income. There is nothing exhibited, however, to prevent him from earning money sufficient to discharge the obligation in part, at least, and in view of the circumstances which gave rise to the obligation and its nature, a trier of fact is-

sues might reasonably believe that something volunteered or forced might come from him in fealty thereunto. The record therefore lacks support for a ruling, as a matter of law, that the mother is disqualified on account of her financial condition, and this in turn deprives the fact of Mrs. Dilworth's superior wealth of any controlling force, if, indeed, the fact have relevancy at all. Legate v. Legate, 87 Tex. 248, 28 S. W. 281.

Accordingly, we hold the final award of custody to be coram non judice and recommend that the judgment of the Court of Civil Appeals be reversed and that the cause be remanded.

CURETON, C. J. Judgments of the district court and Court of Civil Appeals reversed and cause remanded to the district court, as recommended by the Commission of Appeals.